Opinion issued August 21, 2008













     





In The
Court of Appeals
For The
First District of Texas




NO. 01-06-00535-CV




TENNESSEE GAS PIPELINE COMPANY, Appellant

V.

TECHNIP USA CORPORATION AND TECHNIP, S.A., Appellees

* * *

TECHNIP USA CORPORATION AND TECHNIP, S.A., Appellants

V.

TENNESSEE GAS PIPELINE COMPANY, Appellee




On Appeal from the 165th District Court
Harris County, Texas
Trial Court Cause No. 2002-60134




MEMORANDUM OPINION ON REHEARING

          This is a breach of contract dispute brought by Tennessee Gas Pipeline
Company (“TGP”) against Technip USA Corporation (“Technip USA”) and its
parent, Technip S.A. (collectively, “Technip”). TGP engaged Technip USA to
construct improvements along an interstate gas pipeline owned by TGP pursuant to
a “Lump Sum Turnkey, Engineering, Procurement and Construction Contract”
(“Contract”). After project delays occurred, TGP sued Technip to recoup its
additional expenses and for allegedly defective work. Technip counterclaimed to
recover sums owed under the Contract. A jury found that Technip had breached the
Contract and awarded delay damages and defective work damages to TGP. 
Subsequently, on the motion of Technip, the trial court limited the jury award to
certain defective-work damages. Both TGP and Technip have appealed. TGP seeks
the total jury award; Technip seeks a holding that TGP take nothing on its claims.
          In its appeal, TGP contends that the trial court erred by denying its Motion for
Judgment and by granting Technip USA’s Motions for Summary Judgment
Regarding TGP’s damages, Technip’s Motion to Disregard the Jury Findings, and
Technip’s Motion for Entry of Judgment Notwithstanding the Verdict because (1) the
total damages awarded by the jury constitute “direct damages” to which TGP is
entitled as a matter of law; (2) the evidence is legally sufficient to support the jury’s
finding of damages; and (3) Technip S.A. was required, pursuant to the guaranty it
executed, to pay all damages arising from Technip USA’s breach of the Contract
without limitation. 
          In its appeal, Technip contends that the trial court erroneously denied its
Motion for Judgment Notwithstanding the Verdict on TGP’s defective workmanship
claims because (1) such claims are barred by the exclusive remedy provisions of the
agreement; (2) the evidence is insufficient to support the damages awarded on certain
defective work claims; and (3) the trial court improperly applied the stipulated
retainage offset and improperly calculated interest and attorney’s fees.
          On December 21, 2007, we reversed and rendered, in part, and affirmed as
modified, in part, the judgment of the trial court in this case. TGP moved for
rehearing. We grant the motion, withdraw the opinion dated December 21, 2007, and
issue this opinion in its stead. Our disposition and judgment remain unchanged.
          We reverse and render, in part, and affirm as modified, in part.
 
 
 
FACTS AND PROCEDURAL HISTORY
          TGP


 owns and operates 14,200 miles of pipeline through which it transports
6.4 billion cubic feet of gas each day from Texas to the northeastern United States. 
Technip USA is an engineering and construction contractor in the oil and gas
industry. TGP and Technip USA


 have conducted business with one another since
the 1960s.
          On August 6, 1999, TGP contracted with Technip USA for the replacement and
upgrade of six compressors


 on one of TGP’s main transmission lines, known as the
“TGP 100 Line Horsepower Replacement Project” (“Project”), for a “lump sum, fixed
amount” of $86,740,000 (“Contract Price”).


 Work on the Project commenced
immediately. TGP expected the Project to be completed within 17 months. Technip
contends that the schedule for completion was never formally finalized. Completion
of the Project took three years.
 
          The Agreement
          The progress and completion of the Project was formally governed by Article
5.2 of the Contract, which provides as follows, in pertinent part: 
Project Schedule; Critical Path Schedule. [Technip USA] shall perform
the Work [its duties and obligations] in accordance with the schedule
and management plan set forth in Exhibit E (the “Project Schedule”). 
Within twenty (20) days after the Effective Date, [Technip USA] shall
submit, for [TPG’s] review and approval, a critical path method
(“CPM”) schedule which conforms to the Project Schedule and which
sets forth the timing of all elements of the Work and the
interrelationship of such elements. 
It is undisputed that there was never a Project Schedule “set forth in Exhibit E” of the
Contract, as contemplated by Article 5.2. 

          According to TGP, contemporaneous with the formation of the Contract, a
Project Schedule was formulated and was circulated at a meeting involving both
parties. The Project Schedule specified that Technip USA would complete the project
within 17 months of execution of the Contract. In addition, according to TGP, a CPM
schedule was created, also specifying that Technip USA would complete the Project
within 17 months. TGP contends that it remained in constant communication with
Technip USA and that all parties understood that the Project Schedule governed the
project. In addition, contends TGP, the Project Schedule was incorporated into the
Contract through Article 19.13, which provides that “[a]ll Exhibits, Schedules or
other attachments referenced in this Agreement shall be incorporated into this
Agreement by such reference and shall be deemed to be an integral part of this
Agreement.”

          Article 5.2A of the Contract also provides that “[m]odifications to the critical
path of the Project Schedule shall only be made with the approval of [TGP]” and that
“[t]he Project Schedule shall be revised as required under Section 6.5.” Article 6.5
provides that “the Project Schedule may only be adjusted to the extent that [Technip
USA] can demonstrate that the change impacted the critical path of the Work” and
that Technip USA is required to attempt to accelerate the performance of work to
minimize the impact of any changes on the Project Schedule.

          Pursuant to Article 5.2C, if Technip USA failed to achieve “Substantial
Completion within sixty (60) days following that Station’s Substantial Completion
Date, then the provisions of Section 13.2 shall apply.” Article 13.2 was a liquidated
damages provision that TGP agreed to remove from the Contract in exchange for a
$1.5 million decrease in the Contract Price. The balance of Article 13 provides that
“[t]ime is of the essence in the performance” of the Contract and that Technip USA
“guarantees that, subject to such adjustments as may be provided hereunder,
Substantial Completion shall occur not later than the Substantial Completion Date on
a station-by-station basis.”

 
          Attached to the Contract is a parent guaranty executed by Technip S.A.,
guaranteeing the obligations of Technip USA under the Contract and agreeing to
indemnify TGP against damages arising from a breach of the Contract by Technip
USA.

          The Dispute 

          During the course of the Project, numerous delays occurred that each party
attributed to various causes—including issues with the components being installed,
issues involving the new technology or new applications of technology being
employed, delays in change orders, shortages of skilled labor, and inclement weather. 
Ultimately, the Project achieved substantial completion in April of 2002


—delays
having ranged from six to twenty months in the completion of five of the six
compressor stations. Specifically, Stations 47, 54, 63, 87, and 110 are the subject of
this dispute.


 

          In May 2002, Technip USA requested an “equitable adjustment” to the
Contract Price based on increased costs incurred as a result of the extended work
periods. During October and November 2002, Technip filed $12.8 million in liens
against the Project. On November 22, 2002, TGP sued Technip to recover its
increased costs, alleging that Technip USA’s delays constituted a breach of the
Contract.


 

          Technip moved for summary judgment on the grounds that TGP’s claims for 



  1. Project delay costs, sustained in the past



  2. Excess gas use differential costs, sustained in the past



  3. Excess lube oil costs, sustained in the past



  4. Excess labor costs, sustained in the past



  5. Extra power at Station 63 costs, sustained in the past



  6. Backup generator costs, sustained in the past



  7. Allowance for funds used during construction, sustained in the past



  8. Premature energization costs at Station 54, sustained in the past




constituted claims for incidental or consequential damages and that such damages
were specifically excluded under Article 19.1 of the Contract, as follows:
Consequential Damages: Notwithstanding any other provisions of this
Agreement to the contrary, in no event shall Owner or Contractor be
liable to each other for any indirect, special, incidental or consequential
loss or damage including, but not limited to, loss of profits or revenue,
loss of opportunity or use incurred by either Party to the other, or like
items of loss or damage; and each Party hereby releases the other Party
therefrom. 
 
          In addition, Technip contended that TGP’s workmanship claims for


  9. Realignment of compressor costs



10. Excessive blowdown costs, sustained in the past



11. Replacement and installation of operable oil fill system and repair costs for 
 air dryers, sustained in the past



12. Review “as-built” drawings, to be reasonably sustained in the future



 
were precluded because TGP failed to make written warranty claims as required
under the Contract. The trial court granted Technip’s motion, in part, holding that
claims 1–6, and 8 above were barred and that TGP take nothing on those claims.
          TGP moved for a partial summary judgment “on the liability portion of its
claim that Technip USA breached the Contract by failing to complete the project
according to the Project Schedule,” which the trial court denied.
          Subsequently, on November 19, 2004, The Honorable Reece Rondon of the
334th District Court of Harris County voluntarily recused himself. The case was
transferred to The Honorable Elizabeth Ray of the 165th District Court of Harris
County.
          The case was tried to a jury beginning October 27, 2005. At a pre-trial hearing,
the trial court instructed the parties to place all of their evidence concerning damages
before the jury, that the jury would be instructed to determine whether a breach
occurred and, if so, to determine the award of damages applicable without regard to
whether such damages were precluded under the Contract, and that the trial court
would later determine which damages were barred as a matter of law. 
          The jury found that Technip USA breached the Contract by unreasonable delay
and awarded $18,468,361.73 in damages to TGP as follows:


  1. Project delay costs, sustained in the past

$4,030,672.07



  2. Excess gas use differential costs, sustained in the past

$4,617,717.00



  3. Excess lube oil costs, sustained in the past

$ 233,933.04



  4. Excess labor costs, sustained in the past

$ 950,560.94



  5. Extra power at Station 63 costs, sustained in the past

$ 30,540.23



  6. Backup generator costs, sustained in the past

$ 34,871.69



  7. Allowance for funds used during construction, sustained 
 in the past

$6,427,535.70



  8. Premature energization costs at Station 54, sustained in 
 the past

$ 452,368.13



  9. Realignment of compressor costs

$ 964,170.02 



10. Excessive blowdown costs, sustained in the past

$ 14,160.00



11. Replacement and installation of operable oil fill system 
 and repair costs for air dryers, sustained in the past

$ 156,292.91 



12. Review “as-built” drawings, to be reasonably sustained 
 in the future

$ 555,540.00



In addition, the jury found that TGP did not breach the Contract. 
          Technip moved to disregard the jury findings and for judgment notwithstanding
the verdict on the grounds that (1) TGP’s delay-related damages were barred by the
consequential damages provision of the Contract; (2) TGP’s workmanship-related
claims were barred by the warranty and exclusive remedy provisions of the Contract;
(3) there was no evidence of causation as to TGP’s delay-related damages; and (4)
there was no evidence that Technip breached the Contract by unreasonably delaying
beyond any deadline fixed by the Contract. TGP moved for judgment on the verdict
on the grounds that its damages were “direct damages” caused solely by Technip
USA’s delay.
          The trial court granted each motion in part. The trial court limited the jury
award to certain defective work claims—awarding TGP damages for “Realignment
of compressor costs,” “Replacement and installation of operable oil fill systems,” and
“Review ‘as-built’ drawings.” In addition, the trial court awarded to TGP pre- and
post-judgment interest and, as the parties had stipulated, $1.1 million in attorney’s
fees. The trial court held that Technip was entitled to a credit against the judgment
of the $1,650,000 retainage held by TGP, “as stipulated by the parties.” The trial
court held Technip S.A. jointly and severally liable as guarantor for payment of the
judgment. 
 
          Technip USA moved to modify the judgment and for a new trial, which were
overruled by operation of law. TGP and Technip have appealed. TGP seeks to
recover the entire jury award; Technip seeks a holding that TGP take nothing on its
claims.I. TGP’s AppealIn its appeal, TGP contends that the trial court erred by denying its Motion for
Judgment and by granting Technip USA’s Motions for Summary Judgment
Regarding TGP’s damages, Technip’s Motion to Disregard the Jury Findings, and
Technip’s Motion for Entry of Judgment Notwithstanding the Verdict because (1) the
total damages awarded by the jury constitute “direct damages” to which TGP is
entitled as a matter of law; (2) the evidence is legally sufficient to support the jury’s
finding of damages; and (3) Technip S.A. was required, pursuant to the guaranty it
executed, to pay all damages arising from Technip USA’s failure to perform under
the Contract.The Jury Award
          In its first issue, TGP contends that the trial court erred by granting Technip’s
Motion for Judgment Notwithstanding the Verdict because the total damages awarded
by the jury constituted “direct damages” to which TGP is entitled as a matter of law. 
TGP contends that it is entitled to recover the total damages awarded by the jury
because (A.) it is entitled, as a matter of Texas contract law, to recover its “benefit-of-the-bargain,” namely, “to have efficient compressors in place in seventeen months,”
and (B.) the plain language of the Contract’s damages provision does not limit
recovery for “direct damages.” 
Standard of Review
          A trial court may disregard a jury finding and enter a judgment notwithstanding
the verdict (“JNOV”) if the finding is immaterial or if there is no evidence to support
the finding. Tiller v. McClure, 121 S.W.3d 709, 713 (Tex. 2003); Spencer v. Eagle
Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994); Williams v. Briscoe, 137
S.W.3d 120, 124 (Tex. App.—Houston [1st Dist.] 2004, no pet.). A question is
“immaterial” when it should not have been submitted to the jury, it calls for a finding
beyond the province of the jury, such as a question of law, or when it was properly
submitted but has been rendered immaterial by other findings. Se. Pipe Line Co. v.
Tichacek, 997 S.W.2d 166, 172 (Tex. 1999); Spencer, 876 S.W.2d at 157.
A.      Benefit of the Bargain
          The objective in awarding damages for a breach of contract is to provide just
compensation for the loss actually sustained by the complaining party. Phillips v.
Phillips, 820 S.W.2d 785, 788 (Tex. 1991). Damages for breach of contract protect
three interests: a restitution interest, a reliance interest, and an expectation interest. 
See O’Farrill Avila v. Gonzalez, 974 S.W.2d 237, 247 (Tex. App.—San Antonio
1998, pet. denied). The general measure of damages in a common-law breach of
contract claim is just compensation for the loss or damage actually sustained,
commonly referred to as the “benefit-of-the-bargain.” Bowen v. Robinson, 227
S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). The “benefit-of-the-bargain” measure represents the difference between the value expected from the
contract and the value actually received by the non-breaching party. Frost Nat’l Bank
v. Heafner, 12 S.W.3d 104, 111 n.5 (Tex. App.—Houston [1st Dist.] 1999, pet.
denied). The proper measure of damages is a question of law for the court, and the
court’s charge should limit the jury’s consideration to facts that are properly a part of
the damages allowable. Allied Vista, Inc. v. Holt, 987 S.W.2d 138, 141 (Tex.
App.—Houston [14th Dist.] 1999, pet. denied). 
          Actual damages are either “direct” or “consequential.” Arthur Andersen & Co.
v. Perry Equip. Corp., 945 S.W.2d 812, 816 (Tex. 1997). Direct damages are those
that flow naturally and necessarily from the breach. Id. “Direct damages compensate
for the loss, damage, or injury that is conclusively presumed to have been foreseen
or contemplated by the party as a consequence of his breach of contract or wrongful
act.” Id. “Consequential damages” are those which result naturally, but not
necessarily, from the breach. Id. Consequential damages must be foreseeable and
must be directly traceable to the wrongful act and result from it. Id.
          A general measure of damages is subject to any agreement that the parties
might have made with respect to damages because parties to a contract are free to
limit or modify the remedies available in the event of a breach of the contract. GT &
MC, Inc. v. Tex. City Refining, Inc., 822 S.W.2d 252, 256 (Tex. App.—Houston [1st
Dist.] 1991, writ denied); see also Heafner, 12 S.W.3d at 110–11 (reversing award
of consequential damages when contract excluded liability for consequential
damages). 
          Here, the Contract reflects that TGP and Technip agreed to limit the remedies
available in the event of a breach of the Contract. Hence, TGP’s ability to recover its
full expectancy interest, or the full benefit of its bargain, is subject to limitations. We
consider the nature of the contractual limitations and whether they apply to the
damages at issue in this case.
B.      Contractual Limitations
          The parties agreed at Article 19.1 of the Contract to limit the remedies
available, as follows:
Consequential Damages: Notwithstanding any other provisions of this
Agreement to the contrary, in no event shall Owner or Contractor be
liable to each other for any indirect, special, incidental or consequential
loss or damage including, but not limited to, loss of profits or revenue,
loss of opportunity or use incurred by either Party to the other, or like
items of loss or damage; and each Party hereby releases the other Party
therefrom.The parties do not dispute that Article 19.1 precludes recovery for incidental or
consequential damages. Rather, TGP contends that its claims constitute “direct
damages” and therefore are not precluded by Article 19.1. Technip contends that all
of TGP’s claims are for incidental, indirect, and consequential damages and thus are
barred by Article 19.1. 
          It is a basic premise of contract interpretation that unambiguous contracts are
construed as a matter of law. Coker v. Coker, 650 S.W.2d 391, 393–94 (Tex. 1983). 
The parties have stipulated that Article 19.1 is unambiguous. When a contract is
unambiguous, “the court must enforce it as written.” Transcon. Gas Pipeline Corp.
v. Texaco, Inc., 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.] 2000, pet.
denied). In construing the contract, we attempt to ascertain the parties’ true intent “as
expressed in the instrument.” Nat’l Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d
517, 520 (Tex. 1995). We presume that the parties intended for every clause to have
some effect. Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).
We give terms their plain, ordinary and generally accepted meaning unless the
instrument shows that the parties used them in a technical or different sense. Id.
 
          Here, we apply these rules of construction to determine whether Article 19.1
precludes TGP’s claims. By its plain language, Article 19.1, entitled “Consequential
Damages,” provides that, without regard to any other provision of the Contract, the
parties agreed to release each from any liability for any “indirect, special, incidental
or consequential loss or damage.” The parties defined such damages within this
provision as including “loss of profits or revenue, loss of opportunity or use” and
“like items of loss or damage.” 
          TGP contends that Article 19.1 has no bearing on its direct damages. TGP
contends that, to the degree its damages could be characterized as lost profits or loss
of use, Article 19.1 “excludes only ‘lost profits’ and ‘loss of use’ that also qualify as
consequential” and does not preclude it from recovering its lost profits and loss of use
that constitute direct damages arising from Technip USA’s breach. 
           Technip contends that the language of Article 19.1 reflects that the parties “set
out general categories of damages that would be excluded—“indirect, special,
incidental and consequential—and then they set out a non-exclusive list of damage
claims that are specifically excluded—loss of opportunity, loss of use, lost profits,
lost revenue, and ‘like items of loss or damage.’” Technip contends that the parties
defined damages for loss of use, opportunity, and profits as being wholly within the
categories of “indirect, special, incidental or consequential damages.” Hence,
contends Technip all claims for loss of use, opportunity, or profits are necessarily
barred under Article 19.1.
          In addition, Technip contends that the parties’ removal of the liquidated
damages provision (which specified damages for delay) demonstrates that the parties
did not intend to place the risk of lost use, opportunity, or profits on Technip USA. 
Technip contends that the Contract, as drafted, left TGP without a remedy for its
delay claims, but that this was negotiated up front and TGP enjoyed a $1.5 million
decrease in the Contract price to assume the risks of delay. TGP contends that the
removal of the liquidated damages provision simply left TGP’s claims unliquidated,
not defunct. 
          In attempting to harmonize Article 19.1 with the other terms of the Contract,
we note that Article 2.5 of the Contract indicates that Technip USA assumed certain
risks—including “all risk related to and any right to claim any adjustment in the
Project Schedule or Contract Price for (i) topography or soil conditions, (ii)
availability of laborers and Subcontractors, (iii) adequate availability and
transportation of Equipment, and (iv) and [sic] breakdown or other failure of
Equipment under the control of or provided by [Technip USA].” In addition,
pursuant to Article 13, Technip USA guaranteed that Substantial Completion would
not be delayed beyond the “Substantial Completion Date on a Station-by-station
basis.” Further, Article 19.2 provides, as follows, in pertinent part:
19.2 Limitation of Liability. Except for [Technip USA’s] liability
arising out of or relating to Articles 12 (warranties), 13 (guarantee of
timely completion), . . . , 5.2C (Substantial Completion Date), . . .
[Technip USA’s] liability arising out of or relating to this [Contract]
shall be limited to 50% of the Contract Price, regardless of whether the
liability arises out of contract, . . . or any other legal or equitable theory.
 
          Hence, Technip USA agreed to assume certain risks and extended a guarantee
with regard to completion. In addition, subject to certain exceptions, the parties
agreed to cap at 50% of the Contract Price any liability of Technip USA arising from
violations of the provisions of the Contract, regardless of the theory of liability. 
Notably, the exceptions include liability concerning warranties and timely
completion, which are not capped.
          Considering the Contract as a whole, we conclude that Article 19.1, as written,
does not preclude any and all liability that arises from delay under the Contract. Had
all such liability been precluded at Article 19.1, Article 19.2 would be rendered
meaningless. We conclude that Article 19.1, “Consequential Damages,” does not
preclude the recovery of direct damages involving loss of use, opportunity, or profits.
          We next consider whether the specific claims at issue constitute claims for
direct or consequential damage: 
 
1.       “Project delay costs”
          TGP contends that it is entitled to the jury award for its “project delay costs”
because the Project took longer to complete than agreed and TGP incurred substantial
expenses for the extended administration. Specifically, TGP asserts that it incurred
extended expenses for labor, travel, environmental contractors, TGP inspectors,
purchase and supply of additional construction consumables, costs for hauling
wastewater from the site, and services and utilities. TGP contends that these expenses
constitute “direct damages” because they naturally and necessarily flow directly from
the breach in that the expenses would not have been incurred but for the breach of the
Contract by Technip. 
          Article 4 of the Contract, “Owner’s Responsibilities,” provides that TGP is
required to provide: permits; construction and permanent power; incoming high
power transmission lines; storage and lay down areas at the Sites; space at the Sites
for construction trailers; water; potable water; fire water; hydrotest media; and
operation personnel for commissioning.” Hence, the parties clearly contemplated that
TGP would incur these costs throughout the Project and a breach of the Contract by
delay naturally and necessarily would cause these costs to be extended over a longer
period of time. 
 
          We conclude that these damages that resulted from the delay represent direct
damages because they clearly flow naturally and necessarily from the breach. See
Arthur Andersen & Co., 945 S.W.2d at 816. Because TGP is expressly responsible
for these costs under the Contract, it can be conclusively presumed to have been
foreseen or contemplated by Technip that, as a consequence of its breach of the
Contract by delay, TGP would have to continue paying these ongoing costs. See id. 
TGP is not precluded from receiving these damages under Article 19.1 of the
Contract.
2.–4.  Loss of efficiency–excess gas, oil, and labor
          TGP characterizes its claims for “excess gas use,” “excess lube oil,” and
“excess labor cost” as damages for “loss of efficiency caused by the delay” and “lost
value.” TGP compared the cost of gas and oil used in the old compressors with what
it anticipates it would have expended had the new, more efficient compressors been
timely installed. As to labor, TGP compared the level of labor costs expended to run
the old equipment during the delay with the labor costs it anticipates it would have
incurred once the highly automated compressors were installed. TGP contends that
these claims represent direct damages because “the entire reason for the Project [was]
to obtain the new compressors on a timely basis.” 
 
          Technip contends that TGP’s claims of lost efficiency constitute claims of
consequential “loss of use” damages and are precluded under Article 19.1. We agree
that the loss of anticipated savings on the projected efficiency of the new compressor
components is not a direct damage because it is too remote to be “conclusively
presumed to have been foreseen or contemplated” by Technip USA as a consequence
of its breach. See Arthur Andersen & Co., 945 S.W.2d at 816; Wade and Sons Inc.
v. Am. Standard, Inc., 127 S.W.3d 814, 823 (Tex. App.—San Antonio 2003, pet.
denied). 
5.       “Power at Station 63”
          TGP contends that it is entitled to damages for providing extended “Power at
Station 63” separately from its “Project delay costs” above. As we concluded in our
analysis of the “Project delay costs,” because TGP is expressly responsible for
providing power under the Contract, it can be conclusively presumed to have been
foreseen or contemplated by Technip that, as a consequence of its breach of the
Contract by delay, TGP would have to continue paying these ongoing costs. See id. 
We conclude that these damages resulting from the delay also represent “direct
damages” because they clearly flow naturally and necessarily from the breach. See
Arthur Andersen & Co., 945 S.W.2d at 816. Hence, these damages are likewise not
precluded under the Contract.
6.        Backup generator at Station 47
          TGP contends that, pursuant to Article 3 of the Contract, Technip was required
to perform its work according to “Good Engineering and Construction Practices” and
to ensure that its work did not “unreasonably interfere with the operation of the
Facilities.” In addition, TGP points to the “Scope of Work” that it contends the
parties agreed on that stated that “[r]etirement of existing equipment shall not begin 
until the replacement horsepower is in service without permission of the Company.” 
TGP complains that Technip USA dismantled an existing backup generator at Station
47 before the new backup generator was fully functional. When a power outage
occurred, TGP was forced to rent a backup generator to ensure continuing operations
and to comply with regulations. TGP contends that it is entitled to recover its costs. 
          Technip contends without discussion that this cost represents an indirect
damage “clearly ancillary to the progress of the Project.”
          We cannot conclude that a power outage and the necessity of a rented backup
generator could have been “conclusively presumed to have been foreseen or
contemplated” by Technip USA at the time the Contract was formed “as a
consequence of [its] breach of contract or wrongful act.” See Arthur Andersen & Co.,
945 S.W.2d at 816. Hence, we cannot conclude that the damages are “direct.” We
conclude that the damages resulted naturally, but not necessarily, from the breach. 
See id. Hence, these damages are “consequential.” Because Article 19.1 of the
Contract precludes recovery for consequential damages, the trial court did not err by
excluding them.
7.       Allowance for funds used during construction
          TGP contends that it paid for the project out of its own funds and that it is
entitled to damages for the interest that accrued “on the total amount TGP had
invested in the Project during the delay period.” Although this claim does not involve
any actual payment to a third party, TGP characterizes this claim as a “a loss of
borrowing power” because it represents interest TGP theoretically could have earned
on its money—generally “ranging from five to six percent”—had it invested the funds
it spent on this project in other investments during the delay period.
          “Interest is an element of damages suffered by the ‘loss of use’ of money.”
Sherrill v. Phillips, 405 S.W.2d 627, 633 (Tex. Civ. App.—Austin 1966, writ ref’d
n.r.e.); see Marrs and Smith P’ship v. D.K. Boyd Oil and Gas Co., 223 S.W.3d 1,
24–5 (Tex. App.—El Paso 2005, pet. denied) (explaining that “interest as interest (eo
nomine) is compensation for the use or detention of money” and “interest as damages
is compensation for lost use of money”). Here, the record shows that Bert Pineda,
TGP’s project manager, testified that “the imputed interest claim is a claim for the
loss of use of those funds.” 
          The lost use of money represents an indirect loss to TGP because any return
that might be attributable to theoretical investments TGP might have made falls
outside its Contract with Technip. See Cont’l Holdings, Ltd. v. Leahy, 132 S.W.3d
471, 475 (Tex. App.—Eastland, 2003, no pet.) (explaining that profits lost on other
contracts or relationships resulting from the breach are “indirect” or “consequential
damages”). Hence, TGP’s interest claim is a consequential “loss of use” claim that
is precluded by Article 19.1 of the Contract.


             
8.       Premature energy costs at Station 54
          TGP contends that it is entitled to damages for premature energy costs at
Station 54 because, asserts TGP, Technip prematurely requested permanent electricity
to Station 54. TGP contracted with the utility company to bring in large transmission
lines to get electricity to the new motors being installed at the compressor stations. 
Pursuant to TGP’s contract with the utility company, TGP was to pay for a specified
amount of electric use to compensate the utility company for laying the transmission
lines. TGP was given a three-month grace period, after which time TGP either had
to begin the use of electricity at the anticipated demand rate or to pay a penalty of
50% of the anticipated demand for each month it did not use any electricity. TGP
contends that Technip USA reported that it was ready for electricity in April 2001 and
that TGP had the power turned on in May 2001, but that it was not until nine months
later that Technip commissioned the units and used the electricity. 
          We conclude that the trial court did not err by excluding this claim from TGP’s
recovery. TGP has not directed us to any provision in the Contract governing this
claim. However, even if Technip’s conduct constituted a breach of the Contract, we
conclude that TGP’s damage is indirect or consequential because it involves a
relationship outside of the Contract between TGP and Technip; namely, this claim
involves a penalty TGP owes under its contract with its utility company. See Leahy,
132 S.W.3d at 475. As an incidental or consequential damage, it is barred by Article
19.1 and the trial court did not err by excluding it.
(Claim 10.)  Excessive blowdown



          TGP contends that it is entitled to damages as a result of excessive blowdown. 
TGP asserts that Technip failed to store certain components properly on the job sites,
which caused rust to form inside the mechanisms. Subsequently, when gas was
introduced into the new facilities, the seals were damaged and certain elements were
not tightened properly. TGP asserts that it was forced to vent gas into the atmosphere
and perform emergency shutdowns that wasted its gas product. TGP contends that
the vented gas represents gas product that TGP was then not able to sell to its gas
customers. We construe TGP’s claim to be for lost profits.
          Lost profits can take the form of direct or consequential damages. Id. Profits
lost on the breached contract itself are classified as “direct damages.” Id.; Hedley
Feedlot, Inc. v. Weatherly Trust, 855 S.W.2d 826, 834 (Tex. App.—Amarillo 1993,
no writ) (holding lost profits from breach of cattle purchase contract to be direct
damage). If a party’s expectation of profit is incidental to the performance of the
contract, the loss of that expectancy is consequential. Naegeli Transp. v. Gulf
Electroquip Inc., 853 S.W.2d 737, 739 (Tex. App.—Houston [14th Dist.] 1993, writ
denied) (holding profits lost as result of inability to use electricity transformer not
delivered in breach of contract to be consequential damage). 
 
          Here, TGP’s expectation of profit through the sale of gas to its customers is
incidental to the performance of TGP’s Contract with Technip USA concerning the
installation of new equipment. We conclude that excessive blowdown damages are
incidental or consequential and, as such, the trial court did not err by excluding this
damage claim. 
          In sum, we conclude that all of TGP’s challenged damages under this issue
were precluded under the terms of the Contract, as a matter of law, except those
damages awarded for “Project delay costs” and “Power at Station 63.” Thus, the
question of damages on all but these two claims should not have been submitted to
the jury and the trial court did not err in disregarding the jury’s findings of damages
on these claims. See Tichacek, 997 S.W.2d at 172. 
          Accordingly, we sustain TGP’s first issue insofar as it concerns TGP’s claims
for “Project delay costs” and “Power at Station 63.” We overrule TGP’s first issue
in all other respects. 
Sufficiency of the Evidence Supporting the Damages
          In its second issue, TGP contends that the trial court erred by limiting the jury
award because there was legally sufficient evidence to support the jury findings of
damages. We consider only those categories of damages that we determined above
are not precluded under the terms of the Contract—those remaining damages are for
“Project delay costs” and for “Power at Station 63.”
          We review a JNOV under a legal sufficiency standard, viewing the evidence
and inferences in the light most favorable to the jury’s finding. City of Keller v.
Wilson, 168 S.W.3d 802, 807 (Tex. 2005) (stating that “the test for legal sufficiency
should be the same for summary judgments, directed verdicts, judgments
notwithstanding the verdict, and appellate no-evidence review”). We will sustain the
granting of a JNOV based on “no evidence” when the record discloses one of the
following: (1) a complete absence of evidence of a vital fact; (2) the trial court is
barred by the rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more
than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital
fact. Id. at 810; Tiller, 121 S.W.3d at 713 (trial court may grant JNOV if there is not
evidence to support jury finding on issue necessary to liability). More than a scintilla
of evidence exists if the evidence supporting the finding “rises to a level that would
enable reasonable and fair-minded people to differ in their conclusions.” Burroughs 
Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995). With regard to damages
awards, the granting of a JNOV is proper if there is no evidence to support the jury’s
damages finding and if the evidence establishes the trial court’s damage award as a
matter of law. Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996).
          TGP contends that “[i]t was not incumbent on TGP to prove what ‘caused’ the
delay or prove that Technip USA was culpable in the delay”; rather, that “the delay
by itself was a breach of contract and caused substantial damage.” We disagree that
TGP bears no burden to prove causation. Recovery under a breach of contract claim
requires proof of four elements: (1) the existence of a valid contract, (2) performance
or tendered peformance by the plaintiff, (3) breach of the contract by the defendant,
and (4) damages sustained by the plaintiff as a result of the breach. Crowder v.
Sheirman, 186 S.W.3d 116, 118–19 (Tex. App.—Houston [1st Dist.] 2005, no pet.). 
          TGP contends that the record is replete with evidence supporting the jury’s
award of damages for project delay costs and for power at Station 63. 
          The record shows that TGP submitted evidence of its project delay damages in
the form of a chart summary of the expenses it incurred by station for each category
of costs during the delay or schedule “slip.” In addition, to support the chart
summary, TGP submitted a breakdown of expenses per station, listing individual
payments made on particular dates within each category of expenses.
          In addition, Winston Johnson, El Paso’s Senior Vice President of Engineering,
testified that he met with Technip USA in July 2000 regarding Technip USA being
behind schedule. Concrete at Station 47 had been poured incorrectly by Technip
USA and had to be redone. Johnson testified that he met with Technip USA again in
November 2000 and discussed the lack of progress. Johnson testified that Technip
USA never asked for schedule adjustments or submitted change orders regarding the
schedule. Johnson also testified that Stations 47, 63, and 87 all had “significant
changes to the scope of work” by TGP. However, Johnson also testified that the
project involved state-of-the-art technology and that TGP’s engineers concluded that
there were issues with the design of the new units, namely, vibration problems and
alignment issues.
          Dewey McLain, Vice President of Construction for Technip, testified that the
engineering was not on schedule, which he attributed, in part, to delays in the
document flow between Technip USA and Wartsila (the manufacturer of the
components).
          William Ellison, Vice President of Engineered Product Sales for CSI (third
party that assembles the compressors on skids), testified that the Project involved
cutting-edge technology and that there were a number of change orders. Ellison
testified that there were problems with vibration in the units. Ellison testified that his
company was forced to cease work internally on some occasions because it would
receive requests or instructions to change scope without written authorization or
assurances that CSI would be paid for the changes. 
          Mike Hanson, an engineering and construction consultant testifying on behalf
of TGP, testified that Technip USA installed equipment improperly and wiring had
to be redone. Hanson also testified that certain components were not stored properly,
which caused rust problems and subsequent leaks, and that Technip USA was at fault
because it was in charge of the work site and storing the machines. Hanson also
testified that some of the delays that occurred were not the fault of Technip USA and
that he did not do a critical path analysis to determine whether any certain delay was
attributable to Technip USA or to TGP.
          Bert Pineda, TGP’s project manager for the Project, testified that Technip USA
was 100 percent at fault for the delay. Pineda testified that he met with Technip USA
personnel to determine the cause of the delays. Technip USA had labor problems at
Station 63. There were commissioning problems at Stations 47, 63, and 87 that were
attributable to Technip USA having improperly stored the engines. Rust formed in
the engines, which caused broken seals and leaks in water pumps. Pineda testified
that there were delays at TGP in approving change orders, but that this was
attributable to Technip USA’s submission of orders that contained errors in the
structure and pricing. 
          Pineda also testified regarding his methodology to determine the delay
damages. Pineda testified that he added up all of the time between what was
apparently the first day after the date of demobilization and the date of actual
substantial completion, and then attributed 100% of the delay in this period to
Technip USA. Pineda testified that he did not determine if, within each delay period,
Technip USA actually caused the delay. Pineda stated that he did not identify
whether any of the issues he believed Technip USA did wrong were associated with
any particular period of delay. Pineda testified, for instance, that there were
permitting delays as Stations 47, 63, and 87, but that these delays were not taken into
account. Pineda also testified that there were numerous alignment issues, but that
delays attributable to modifications were not taken into account. Pineda testified that
he did not consider what percentage of the delay issues were attributable to TGP and
what percentage could be attributed to Technip USA.
          We conclude that this evidence constitutes more than a scintilla because it
“rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions.” Crye, 907 S.W.2d at 499. We hold that, having reviewed all of the
evidence in the light most favorable to the jury’s finding, the trial court’s granting of
a JNOV as to the damages was improper because there is evidence to support the
jury’s damages finding. See Wilson, 168 S.W.3d at 807; Cazarez, 937 S.W.2d at 450.
          Accordingly, we sustain TGP’s second issue insofar as it relates to its damages
for “Project delay costs” and “Power at Station 63.” We overrule TGP’s second issue
in all other respects.
Parent Guaranty
          In its third issue, TGP contends that the trial court erred by limiting the jury
award because Technip S.A. was required, pursuant to the guaranty it executed
(“Guaranty”), to pay all of TGP’s damages arising from Technip USA’s breach of the
Contract. 
          A guarantor’s liability is measured by the principal’s liability unless a more
extensive or more limited liability is expressly provided for in the guaranty. W. Bank-Downtown v. Carline, 757 S.W.2d 111, 113 (Tex. App.—Houston [1st Dist.] 1988,
writ denied). To determine the extent of the guarantor’s liability, we look to the
language of the guaranty agreement. Id. If the guaranty agreement is so worded that
it can be given a certain or definite legal meaning or interpretation, it is not
ambiguous, and we construe the contract as a matter of law. Id. at 114. If uncertainty
exists as to the meaning of the guaranty contract, and if two reasonable interpretations
may be made, we apply the construction most favorable to the guarantor. Coker, 650
S.W.2d at 394 n.1 (explaining that “guarantor is entitled to have his agreement strictly
construed so that it is limited to his undertakings, and it will not be extended by
construction or implication”); Clarke v. Walker-Kurth Lumber Co., 689 S.W.2d 275,
278 (Tex. App.—Houston [1st Dist.] 1985, writ ref’d n.r.e.). 
          Here, the Guaranty provides as follows, in pertinent part:
1. GUARANTY 
 a. On the terms and subject to the conditions contained herein,
[Technip S.A.] hereby irrevocably and unconditionally
guarantees, to and for the benefit of [TGP], the performance of all
[Technip USA’s] obligations contained in the [Contract] in
accordance with the terms hereof. . . .
 b. If, for any reason, [Technip USA] shall fail or be unable to duly,
punctually, or fully perform the Guaranteed Obligations or
commits any breach thereof, then upon [TGP’s] request to that
effect, [Technip S.A.] shall forthwith perform or shall cause a
third party acceptable to [TGP] to perform such obligations and
shall indemnify and keep indemnified [TGP] against any loss,
damages, costs and expenses arising from the said failure or
breach for which [Technip USA] may be liable in accordance
with the [Contract], as if it was the primary obligor.   c.[Technip S.A.’s] obligations and liability under this Guaranty
shall in no event exceed [Technip USA’s] obligations and liability
under the [Contract].
          2. OBLIGATIONS
 [Technip S.A.] agrees that the obligations of [Techip S.A.] set
forth in this Guaranty shall be absolute and unconditional, shall
not be subject to any counterclaim, set-off-deduction, . . .
reduction, or defense (other than full and strict compliance by
[Technip S.A.] with its obligations hereunder) based upon any
claim [Technip S.A.] may have against [Technip USA] . . . .
          The trial court held Technip S.A. jointly and severally liable as a guarantor for
payment of the judgment. The parties do not dispute that Technip S.A. is liable to
TGP under the Guaranty; rather, the parties dispute the extent of that liability.

          TGP contends that the Guaranty required Technip S.A. to “keep TGP whole for
any breach of the Contract by Technip USA” and that the “evidence conclusively
established that Technip failed to do so.” Specifically, to support its position, TGP
directs us to paragraph 1b of the Guaranty which provides that “[i]f, for any reason,
[Technip USA] shall fail or be unable to duly, punctually, or fully perform the
Guaranteed Obligations or commits any breach thereof” Technip S.A. is required to
“indemnify and keep indemnified [TGP] against any loss, damages, costs and
expenses arising from the said failure or breach for which [Technip USA] may be
liable in accordance with the [Contract].” TGP contends that, according to the terms
of the Guaranty, Technip S.A. must reimburse TGP for any loss, damages, or costs
arising from Technip USA’s breach.

          Technip contends that Technip S.A. is liable to the same degree that Technip
USA is liable and no more. Technip contends, and we agree, that the Guaranty
clearly provides that “[Technip S.A.’s] obligations and liability under this Guaranty
shall in no event exceed [Technip USA’s] obligations and liability under the
[Contract].” This language means that Technip S.A. is not liable to TGP beyond the
level of liability imposed on Technip USA. See Carline, 757 S.W.2d at 113–14. 

          TGP contends that Technip’s focus on this language “ignores the rules of
contract construction, which require a court to read the agreement in its entirety and
to harmonize its provisions.” TGP points us to paragraph 1a, which states that:
“[Technip S.A.] hereby irrevocably and unconditionally guarantees, to and for the
benefit of [TGP], the performance of all [Technip USA’s] obligations contained in
the [Contract].” 

          Reading paragraph 1a in its entirety, as we must, we note that TGP omits
significant language from this provision, emphasized as follows:

On the terms and subject to the conditions contained herein, [Technip
S.A.] hereby irrevocably and unconditionally guarantees, to and for the
benefit of [TGP], the performance of all [Technip USA’s] obligations
contained in the [Contract] in accordance with the terms hereof. . . 

 
(Emphasis added.) By its plain language, Technip S.A.’s guarantee of Technip
USA’s obligations is subject to the terms and conditions contained in the Guaranty.
As noted above, those terms include that “[Technip S.A.’s] obligations and liability
under this Guaranty shall in no event exceed [Technip USA’s] obligations and
liability under the [Contract].” 

          In addition, TGP contends that it is entitled to a judgment against Technip S.A.
for the total jury award because the Guaranty prohibits Technip S.A. from claiming
any set-off or defense. TGP contends that, pursuant to the express terms of paragraph
2, Technip S.A.’s obligations are not “subject to any counterclaim, set-off-deduction,
. . . reduction or defense” and therefore Technip S.A. cannot apply any reduction to
the jury award for the retainage at issue and cannot apply the consequential damages
defense asserted by Technip USA. 

          A closer reading of paragraph 2 indicates that Technip S.A.’s obligations under
the Contract are “not subject to any counterclaim, set-off-deduction, . . . reduction,
or defense (other than full and strict compliance by [Technip S.A.] with its
obligations hereunder) based upon any claim the Guarantor [Technip S.A.] may have
against Contractor [Technip USA].” (Emphasis added.) Thus, Technip S.A. is
precluded from claiming that any set-off, reduction, or defense Technip S.A. might
have against Technip USA reduces its liability to TGP. There are not any claims at
issue between Technip USA and Technip S.A. in this case.

          Finally, TGP contends that the Contract required Technip USA to obtain a
guaranty from its parent, Technip S.A., that was to be in the form of Exhibit “T” to
the Contract. TGP contends that the guaranty was to have “no limitation of liability.” 
TGP contends that, because Technip USA failed to execute a guaranty in the form of
Exhibit “T,” and instead executed a different form of guaranty, TGP was prevented
from receiving the benefit of the “intended Technip guaranty, and TGP is entitled to
recover that benefit from Technip USA.” We must enforce a contract as written, not
as one party contends that, in hindsight, it intended for to have been written. See CBI
Indus., Inc., 907 S.W.2d at 520 (ascertaining intent of parties “as expressed in the
instrument”); Texaco, Inc., 35 S.W.3d at 665 (enforcing unambiguous contract as
written). 

          We conclude that the trial court did not err in limiting Technip S.A.’s liability
as guarantor to the liability imposed on Technip USA. 

          Accordingly, TGP’s third issue is overruled.

II. Technip’s Appeal

          In its appeal, Technip contends that the trial court erroneously denied its
Motion for Judgment Notwithstanding the Verdict on the issue of TGP’s
workmanship-related damages because (1) such claims are barred by the exclusive
remedy provisions of the agreement; (2) the evidence is insufficient to support the
damages awarded on the realignment and as-built drawings claims; and (3) the trial
court improperly applied the stipulated retainage offset and improperly calculated
interest and attorney’s fees. 

Defective Workmanship Claims

          In its first issue, Technip contends that the trial court erroneously denied its
Motion for Judgment Notwithstanding the Verdict on the issue of TGP’s
workmanship-related damages because such claims are barred by the exclusive
remedy provisions of the agreement. Specifically, the trial court granted damages to
TGP as awarded by the jury on the following workmanship-related claims:
“Realignment of compressor costs,” “Replacement and installation of operable oil fill
systems,” and “Review of ‘as-built’ drawings.” Technip contends that there is no
evidence that TGP gave notice of the alleged defects to Technip USA, as required
under the Contract. 

B.      Standard of Review

          We review the denial of this portion of Technip’s Motion for Judgment
Notwithstanding the Verdict under a legal sufficiency standard. See Brown v. Bank
of Galveston, 963 S.W.2d 511, 513 (Tex. 1998); CDB Software, Inc. v. Kroll, 992
S.W.2d 31, 35 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). A JNOV should
be entered on “no evidence” when the evidence offered to prove a vital fact is no
more than a scintilla. Wilson, 168 S.W.3d at 823. We view the evidence and
inferences in the light most favorable to the jury’s finding. Id. at 807. With regard
to damages awards, the granting of a JNOV is proper if there is no evidence to
support the jury’s damages finding and if the evidence establishes the trial court’s
damage award as a matter of law. Cazarez, 937 S.W.2d at 450.

C.      Relevant Contractual Provisions 

          The Contract provides, at Article 1, that “‘Defect’ or ‘Defective’ shall have the
meaning set forth in Section 12.1.”

          Article 12.1 defines what constitutes a “defect” and includes issues with quality
of equipment and workmanship. Generally, “[a]ny Work that does not meet the
standards set forth in this Section 12.1 is ‘Defective’ or contains a ‘Defect.’” 

          Article 12.2, “Owner’s Right to Inspect,” provides, in relevant part, as follows:

A. General Rights. All work shall be subject to inspection by [TGP]
at all times to determine whether the Work conforms to the requirements
of the Agreement. [Technip USA] shall furnish [TGP] with access to all
locations where work is in progress . . . . If, in the judgment of [TGP],
any Work is Defective, then [Technip USA] shall, at its expense,
promptly repair or replace the Defective Work. Subject to [Technip
USA’s] right to pursue a dispute under Article 18 (“Dispute
Resolution”), the decision of [TGP] shall be conclusive as to whether
the Work is conforming or Defective, and [Technip USA] shall comply
with the instructions of [TGP] in all such matters while pursuing any
dispute. If it is later determined that the Work was not defective, then
[TGP] shall reimburse [Technip USA] for all costs incurred in
connection with such repair or replacement and a Change Order shall
be issued for such amount and shall address any impact the repair or
replacement may have had on the Project Schedule. If [Technip USA]
fails, after a reasonable period of time not to exceed one (1) week, to
repair or replace any Defective Work, or to commence to repair or
replace any Defective Work and thereafter continue to proceed
diligently to complete the same, then [TGP] may repair or replace such
Defective Work and the expense thereof shall be paid by [Technip
USA].

 
(Emphasis added.)



Article 12.3, “Warranty of Defects,” provides, in relevant part, as follows: A. Defect Period. Except as provided in Section 12.1.D
(“Subcontractor Warranties”), [Technip USA] shall promptly repair or
replace, at no cost to [TGP], any Defective Work, if the Defect appears
or occurs during the twelve (12) month period commencing on
Substantial Completion of the Facilities (the “Defect Period”).

. . . . C.      Remedy. [TGP] shall provide notice to [Technip USA] of the
discovery or any Defective Work as soon as practicable after such
discovery.
D. Repair by Owner. If, after notification of a breach of warranty
under Section 12.3.C., [Technip USA] delays in commencing,
continuing or completing curative action, then [TGP], by written notice
to [Technip USA], may correct such Defect(s) in accordance with this
Contract, and [Technip USA] shall be liable for all reasonable direct
costs, charges and expenses incurred by [TGP] in connection with such
repair or replacement and shall pay to [TGP] an amount equal to such
costs, charges and expenses upon receipt of an invoice from [TGP]. 

 
Article 12.5 of the Contract provides that 

 
[t]he warranties provided under this [Contract] are the sole and
exclusive warranties provided by [Technip USA]. No other warranties,
express or implied, are provided by [Technip USA] hereunder. Owner’s
remedies are limited to those described herein.

D.      Analysis 

          Technip USA contends that Article 12.3C required TGP to give notice to
Technip USA of any work it deemed defective and that Article 12.3D required that,
after such notice, if Technip USA failed to cure the defect, TGP was required to give
written notice that it would correct the defect and then Technip USA would be liable
for such costs. Technip USA contends that there is no evidence that TGP provided
the required written notice of the defects at issue, that TGP gave Technip USA a
chance to cure the defects, or that TGP gave written notice that it would repair the
defects at Technip USA’s expense. Technip USA contends that, as such, TGP did not
avail itself of the warranty provision in the Contract, which, pursuant to Article 12.5,
was its exclusive remedy.

          On the other hand, TGP contends that it was not required to give written notice
of defects under the Contract. TGP contends that “[t]he ‘Defect Period’ for Warranty
claims under Article 12.3 does not begin until after substantial completion and after
all of the Work required by the Contract has been completed.” TGP contends that
Article 12.2 governs because the workmanship issues first arose while work was in
progress (prior to substantial completion) and that nothing in Article 12.2 required
TGP to give notice to Technip USA concerning such defects. 

          Article 12.2 provides that TGP has a right to inspect the work “at all times” to
determine whether work conforms to the Contract; that “Contractor [Technip USA]
shall furnish Owner [TGP] with access to all locations where work is in progress”;
that if, in TGP’s judgment, any work is defective, then Technip USA will promptly
repair or replace the defective work; and that, if it is subsequently determined that
work was not defective, then TGP will reimburse Technip USA for costs and that “a
Change Order shall be issued for such amount and shall address any impact the
repair or replacement may have had on the Project Schedule.” (Emphasis added.) 
Based on the emphasized language, Article 12.2 clearly contemplates that it applies
while work is in progress.

          The record shows that, concerning TGP’s claim for “Review of ‘as-built’
drawings,” this claim arose in 2004, when TGP went out to Station 54 and discovered
an error in the as-built drawing of that station. The certificate of substantial
completion was executed on Station 54 on April 19, 2002. Hence, this claim arose
after substantial completion. 

          Concerning TGP’s claim for “Replacement and installation of operable oil fill
systems,” the record shows that TGP discovered that, when it came time to service
the engines, it took three to four days to refill the oil. The delay caused significant
interruptions in TGP’s use of their stations. According to Pineda, TGP redesigned
the “existing system” by bypassing the tank that sat on top of the building and
attaching a larger line to transfer oil faster. Hence, TGP discovered that it had a
design problem after the stations were in use and after the time came to service the
engines. 

          TGP contends that its issue of “Realignment of compressor costs,” which it
also characterizes as an issue with the “anchor bolts” that held equipment to the floor,
began prior to substantial completion of the project (while work was in progress) and
that the issues were never rectified. TGP argues that the anchor bolts were “never
finished,” as evidenced by their inclusion on various punch lists,


 and that they could
not have constituted a warranty issue. However, TGP also characterizes the issue as
follows:

          •   “During construction an issue arose regarding the torque value (or tension)
that had been applied to the bolts. . . .” (Emphasis added.) 
          •   “Technip agreed to remove and reinstall the equipment and each of the
anchor bolts.” (Emphasis added.) 
          •   “To remove the anchor bolts[,] all of the equipment had to be removed then
reassembled and realigned.” (Emphasis added.)
          •   “Technip failed to properly align ten (10) HP replacement units . . . .
Because of this misalignment, TGP has had to institute immediate
corrective measures to rectify this situation.”

          The emphasized language demonstrates that TGP’s claims were for work that
had been performed, but allegedly had been performed improperly and needed to be
removed and reinstalled. Thus, TGP’s claims are not, as TGP urges, for a simple
breach of contract that arose through a failure to perform the work at all. See Sw. Bell
Tel. Co. v. FDP Corp., 811 S.W.2d 572, 574–76 (Tex. 1991) (distinguishing between
breach of contract claim and breach of contractual warranty provision claim and
applying outside Uniform Commercial Code).

          According to the record, by April 19, 2002, certificates of substantial
completion had been executed on all of the stations at issue in this appeal. Article
12.3A provides that Article 12.3 governs any defect that “appears or occurs during
the twelve (12) month period commencing on Substantial Completion.” Hence, at the
point of substantial completion, any “defective work” that arose or existed necessarily
became a warranty issue because there is no other provision in the Contract that
governs defects in workmanship that exist after substantial completion occurs. 
Article 12.2, which speaks of access to locations where work is in progress, change
orders, and impact on project schedules, logically, is of no effect once the project is
substantially completed. Hence, we conclude that Article 12.3 governs.

          Even if we concluded that Article 12.2 governs, we could not construe Article
12.2 in the manner that TGP advances, namely, that no notice is required under
Article 12.2. First, as a practical matter, Technip could not know that, “in the
judgment of [TGP],” certain work is defective unless TGP gives notice to Technip of
those defects. Second, Article 12.2 allows Technip “one week” to repair or replace
defective work. Without notice from TGP as to the existence of a defect, it is not
possible for Technip to calculate when that “one week” period begins or ends. 
Finally, Article 12.2 provides that, should Technip fail within that week to repair or
replace any defective work, “then [TGP] may repair or replace such Defective Work
and the expense thereof shall be paid by [Technip].” We cannot logically construe
Article 12.2 to require Technip to bear the cost of rectifying any work that TGP
deems is defective, without notice.

          TGP contends that Technip had actual notice of defects and that actual notice
was sufficient under Article 12.2. However, pursuant to Article 19.7: “Any notice,
demand, offer, or other written instrument required or permitted to be given pursuant
to this Contract shall be in writing signed by the Party giving such notice . . . .” 

          We conclude that Article 12.3 governs and that written notice of defects was
required. 

          TGP contends that it gave written notice of defective work. On the realignment
claim, TGP directs us to an email concerning a suggested way to rectify the
alignment; a letter from CSI to Technip USA concerning measures taken to realign
the skids; and punch lists from Station 47 and 87. As to the oil fill systems, TGP
directs us to what appear to be internal emails concerning the issue. As to the “as
built” drawings, TGP direct us to the testimony of Pineda, who stated that he
“believe[d] there was a letter sent to Technip” on this claim. These items do not
constitute evidence that TGP gave notice of defects to Technip USA pursuant to the
warranty provision in the Contract or that, after Technip USA failed to take curative
action, TGP submitted written notice that it would repair the defects at the expense
of Technip USA. 

          TGP asserts in its motion for rehearing that it “provided notice of default
related to the failure to complete the anchor bolt/alignment issues on June 26, 2003,
after suit was filed but before all of the work related to this claim was completed.”
The record shows that, on June 26, 2003, TGP gave Technip written “notice of
default and defect due to Technip’s failure to properly complete portions of the scope
of work,” pursuant to Article 12.3C. TGP asserted, in part, that Technip had “failed
to properly align the ten (10) HP relacement units at Stations 47, 54, 63, 87 and 96,”
and that “[b]ecause of this misalignment, TGP has had to institute immediate
corrective measures to rectify this situtation.” In its letter, TGP also asserted that
Technip had “failed to remedy past punch list items and other construction defect
items.”

          This letter indicates that TGP considered its defective workmanship claims to
be Article 12.3 warranty issues. However, even if TGP’s letter of June 26, 2003
could have provided the required notice under Article 12.3, it came too late. 
Substantial Completion on the final station at issue occurred on April 19, 2002. The
12-month warranty period commenced on that same date, pursuant to Article 12.3A. 
Hence, the 12-month period expired on April 19, 2003. TGP’s letter of June 26, 2003
came three months too late. We conclude that this is not evidence that TGP gave
written notice of defects within the “Defect Period,” as required under the Contract.

          Article 12.5 provides that “the warranties provided under this [Contract] are the
sole and exclusive warranties provided by the Contractor. No other warranties,
express or implied, are provided by the Contractor hereunder. Owner’s remedies are
limited to those described herein.” Therefore, when TGP failed to give notice as
required, it failed to invoke Article 12, and it failed to avail itself of its exclusive
remedy under the Contract. 

E.      Waiver

           TGP asserts that Technip USA waived this issue on appeal because it failed to
plead lack of notice as an affirmative defense. Texas Rule of Civil Procedure 94
requires the affirmative pleading of certain specified defenses and of “any other
matter constituting an avoidance or affirmative defense.” Tex. R. Civ. P. 94. 
Generally, if an affirmative defense is not pleaded or tried by consent, it is waived. 
Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc., 889 S.W.2d 666, 671 (Tex.
App.—Houston [14th Dist.] 1994, writ denied). A general denial is insufficient
because it fails to place the plaintiff on notice that defendant intends to bring in
evidence of an independent reason why plaintiff is barred from recovery, even if the
plaintiff proves the elements of his cause of action. Id.

          Here, lack of notice required under the Contract goes directly to TGP’s cause
of action. Performance of any condition precedent is an essential element of a
plaintiff’s breach of contract case. See Assoc. Indem. Corp. v. CAT Contracting, Inc.,
964 S.W.2d 276, 283 (Tex. 1998); see also Centex Corp. v. Dalton, 840 S.W.2d 952,
956 (Tex. 1992) (“A condition precedent is an event that must happen or be
performed before a right can accrue to enforce an obligation.”); Emerald Forest Util.
Dist. v. Simonsen Constr. Co., 679 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.]
1984, writ ref’d n.r.e.) (“When a contract provides for a particular form of notice,
compliance with such provisions is a condition precedent to invoking the contract
rights which are conditioned on the notice.”). Here, TGP was required to plead that
it performed all conditions precedent, which then gave rise to Technip USA’s burden
to specifically deny the performance of any condition precedent. See Tex. R. Civ. P.
54; Beard Family P’ship v. Commercial Indem. Ins. Co., 116 S.W.3d 839, 852 (Tex.
App.—Austin 2003, no pet.). 

          The record shows that, in its answer, Technip USA “specifically denied that
TGP satisfied the conditions precedent for its claims, including adherence to the
contractual procedures for asserting warranty-type claims relating to alleged defects.”
As Technip USA contends, this plea was verified pursuant to Rule 93(12), which
addresses whether “notice and proof of loss or claim for damage has not been given
as alleged.” See Tex. R. Civ. P. 93(12). We conclude that Technip USA did not
waive this issue on this basis.

          In its motion for rehearing, TGP contends that Technip failed to use the words
“condition precedent” in its initial brief on appeal and, as such, the issue is waived. 
TGP argues that it was not afforded an opportunity to respond to the applicability of
any “condition precedent” because these words were not used until Technip’s reply
brief.

          In its brief, Technip complained that “[t]here is no legally or factually sufficient
evidence that TGP followed the warranty provisions of the Agreement. . . . Articles
12.3 and 12.5 of the Contract provide that if TGP determines that work is defective,
it must give Technip prompt notice of the defect as soon as practicable, and Technip
will repair or replace that work at its own cost. . . . TGP did not avail itself of the
warranty provisions of the Agreement, which provided its exclusive remedy for
workmanship issues. . . .” In its reply, Technip more specifically referred to this lack
of notice as the failure of a “condition precedent.”

          First, we are required to construe the briefs liberally. See Tex. R. App. P.
38.1(e). Second, as TGP points out its own brief on rehearing, Technip “raised
conditions precedent in its Supplement to its Motion for JNOV” in the trial court. In
addition, in its answer, Technip specifically denied that TGP satisfied the “conditions
precedent” for its claims, including adherence to the procedural requirements in the
warranty provision. The substance of the complaint did not change on appeal. See
Hohenberg Bros. Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976)
(stating that no particular words are necessary for existence of condition, but terms
such as “if,” “provided that,” “on condition that,” or some similar phrase of
conditional language create condition); Emerald Forest Util. Dist. v. Simonsen
Constr. Co., 679 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.] 1984, writ ref’d
n.r.e.) (noting that, when contract provides for particular form of notice, compliance
with form is “a condition precedent” to invoking contract rights conditioned on such
notice).

          Finally, TGP contends that Technip breached the Contract and that such breach
excused TGP from having to comply with contractual notice provisions. Generally,
it is a fundamental principle of contract law that when one party commits a material
breach of mutually dependent, reciprocal promises in a contract, the other party is
discharged or excused from further performance. Mustang Pipeline Co. v. Driver
Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004); see also Joseph v. PPG Indus., Inc.,
674 S.W.2d 862, 867 (Tex. App.—Austin 1984, writ ref’d n.r.e.) (recognizing that
one who breaches contract may not then recover on it). However, if the non-breaching party elects to treat the contract as continuing and insists that the party in
default continue its performance, the previous breach constitutes no excuse for non-performance on the part of the non-breaching party, and the contract continues in
force for the benefit of both parties. Hanks v. GAB Bus. Servs., Inc., 644 S.W.2d 707,
708 (Tex. 1982); Gupta v. E. Idaho Tumor Inst., Inc., 140 S.W.3d 747, 756–57 (Tex.
App.—Houston [14th Dist.] 2004, pet. denied); Chilton Ins. Co. v. Pate & Pate
Enters., Inc., 930 S.W.2d 877, 887–88 (Tex. App.—San Antonio 1996, writ denied). 

          Here, TGP and Technip sued each other for breach of contract. Technip lost
on its claim and did not appeal that ruling. TGP won on its claim and the trial court
awarded damages. On appeal, Technip contends that the trial court erred by awarding
damages to TGP. Hence, Technip is not “relying on the notice provisions” in a
breach of contract suit against TGP. Nor is Technip applying lack of notice as an
affirmative defense (as an independent reason that it should prevail). Rather, Technip
complains that the evidence is legally insufficient to support the verdict because TGP
failed to show evidence of an element of its own claim. See Assoc. Indem. Corp. v.
CAT Contracting, Inc., 964 S.W.2d 276, 283 (Tex. 1998). Most importantly, the
record shows that, at all times during the dispute, TGP treated the Contract as
continuing and TGP continued to demand performance of its terms. Even after TGP
sued on the Contract, it sent a letter to Technip demanding performance under Article
12.3 of the Contract.


 

          We conclude that Technip conclusively proved it is entitled to the JNOV on
these claims. See Wilson, 168 S.W.3d at 823 (stating that JNOV should be entered
on “no evidence” when evidence offered to prove vital fact is no more than scintilla).

          Accordingly, we sustain Technip’s first issue. We do not reach its second
issue, that the evidence was insufficient to support the jury’s damages findings on
these claims. 

 
 
 
Interest and Attorney’s Fees

          In its third issue, Technip contends that the trial court improperly (1) applied
the stipulated retainage offset, (2) calculated interest, and (3) applied attorney’s fees.

1.       Stipulated retainage offset 

          Over the course of the Project, TGP withheld a ten percent retainage from its
progress payments. The record shows that, at trial, the parties stipulated that “the
amount of the retainage at issue between the parties will be $1,650,000.” In addition,
the parties stipulated that “should TGP prevail in this case and be awarded damages
that this $1,650,000 retainage amount would be an offset against their damage
award.” 

          On appeal, Technip contends that the trial court erred by failing to provide “for
prejudgment interest on [the retainage] at the rate specified in section 7.7 of the
[Contract] for late payments.” The stipulation is a binding contract between the
parties and the court. Houston Lighting & Power Co. v. City of Wharton, 101 S.W.3d
633, 641 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). A stipulation is
conclusive on the issue, and the parties are estopped from claiming otherwise. Id.
Hence, having stipulated to the amount of the retainage at trial, Technip cannot be
heard to complain of that amount on appeal. 

 
          In addition, Technip contends that the trial court erred by failing to subtract the
stipulated retainage prior to calculating prejudgment interest on the judgment. We
agree. The judgment reflects that damages and interest were calculated, and then
$1,650,000 retainage was subtracted. The retainage should be subtracted from the
principal amount of the judgment prior to the calculation of pre-judgment interest. 
See Pringle v. Moon, 158 S.W.3d 607, 611 (Tex. App.—Fort Worth 2005, no pet.)
(applying offset to damage award prior to calculation of pre-judgment interest).

2.       Interest

          Technip contends that the trial court erred by awarding pre-judgment interest
on the defective workmanship damages because these damages constitute future
damages. Having determined that the trial court erred by denying Technip’s motion
for judgment notwithstanding the verdict as to TGP’s claims of “Realignment of
compressor costs,” “Replacement and installation of operable oil fill systems,” and
“Review of ‘as-built’ drawings,” and thereby determining that TGP take nothing on
these claims, we do not reach the issue of whether the interest on these claims
constitutes interest on future damages. 

          As to TGP’s remaining claims, Technip contends that the trial court generally
applied an incorrect rate of interest in its judgment. Specifically, Technip contends
that the trial court erred by calculating pre-judgment interest at a rate of nine percent,
which is the rate of interest provided in the Contract that is applicable only to any late
payments made to Technip by TGP under the Contract. Technip contends that the
nine percent rate does not apply to pre-judgment interest, nor does the Contract
provide for any specific rate in the event of a breach. Technip contends that when the
interest rate is not specified in a contract, pre-judgment interest should be calculated
based on the statutory rate provided in Texas Finance Code section 304.003(c)(1). 
See Tex. Fin. Code Ann. 304.003(c)(1) (Vernon Supp. 2007). 

          There are two legal sources for an award of pre-judgment interest: (1) common
law equitable principles and (2) an enabling statute. Johnson & Higgins, Inc. v.
Kenneco Energy, 962 S.W.2d 507, 528 (Tex. 1998). However, in Johnson, the Texas
Supreme Court harmonized the common law pre-judgment interest accrual scheme
with that under the Finance Code. Id. The court held that pre-judgment interest is
calculated as simple interest and is based on the post-judgment interest rate applicable
at the time of the judgment. Id. at 532; Tex. Fin. Code Ann. § 304.103. 

          When the interest rate is not specified in a contract, pre-judgment interest
should be calculated based on the statutory rate provided in Texas Finance Code
section 304.003. See Tex. Fin. Code Ann. 304.003; ExxonMobil Corp. v. Valence
Op. Co., 174 S.W.3d 303, 319 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)
(applying section 304.003 in breach of contract claim). Although section 304.003
expressly applies to post-judgment rates, pre-judgment interest is computed at the
same statutory rate. See Tips. v. Hartland Developers, Inc., 961 S.W.2d 618, 624
(Tex. App.—San Antonio 1998, no pet.).

          Here, the record shows that the Contract provides for interest on any late
payments due under the Contract from TGP (as the annual prime plus two percent),
but it does not provide for any rate of interest on damages resulting from a breach of
the Contract by either party. Because an applicable interest rate is not specified in the
Contract, pre-judgment interest is calculated based on the statutory rate provided in
Texas Finance Code section 304.003. See Tex. Fin. Code Ann. 304.003;
ExxonMobil Corp., 174 S.W.3d at 319. 

          Section 304.003(b) provides that “[o]n the 15th day of each month, the
consumer credit commissioner shall determine the postjudgment interest rate to be
applied to a money judgment rendered during the succeeding calendar month.” Tex.
Fin. Code Ann. 304.003(c)(1). Section 304.003(c)(1) provides that, with exceptions
not applicable here, “the postjudgment interest rate is the prime rate as published by
the Board of Governors of the Federal Reserve System on the date of computation.” 
Id. § 304.003(c)(1). That rate is published in the Texas Register by the Secretary of
State. Id. § 304.004. This court may take judicial notice of the correct, published rate
on appeal. Office of Pub. Util. Counsel v. Pub. Util. Comm’n of Tex., 878 S.W.2d 598,
600 (Tex. 1994). 

          Here, when the trial court entered its final judgment on May 18, 2006, the
judgment interest rate as determined by the consumer credit commissioner was 7.75
percent. See Judgment Rate Summary, http://www.occc.state.tx.us/pages/int_rates/

Index.html (last visited Nov. 15, 2007). Thus, the trial court’s judgment should have
reflected pre-judgment interest at the rate of 7.75 percent, rather than 9 percent.

          Accordingly, we sustain Technip’s third issue as it concerns the pre-judgment
interest rate stated in the judgment.

3.       Attorney’s fees

           As to attorney’s fees, Technip contends that, although the parties stipulated to
$1.1 million as reasonable attorney’s fees for the prevailing party, if TGP’s recovery
is reduced in this appeal, the attorney’s fees should likewise be reduced. As TGP
contends, the stipulation is a binding contract between the parties and the court. City
of Wharton, 101 S.W.3d at 641. A stipulation is conclusive on the issue, and the
parties are estopped from claiming otherwise. Id.

          Accordingly, we overrule Technip’s third issue as it concerns attorney’s fees.

CONCLUSIONWe conclude that the trial court erred by granting judgment notwithstanding
the verdict on TGP’s claims for “Project delay costs” and “Power at Station 63.” We
reverse the trial court’s judgment as to these claims and render judgment that TGP is
entitled to the principal damages awarded by the jury on these claims. We modify the
judgment to reflect that the $1,650,000 retainage is subtracted from the principal
amount of the judgment prior to the calculation of pre-judgment interest. In addition,
we modify that portion of the trial court’s judgment awarding pre-judgment interest
at the rate of 9% per year to an award of pre-judgment interest at the rate of 7.75%
per year. See Tex. R. App. P. 43.2(b). Further, we conclude that the trial court erred
by denying Technip’s motion for judgment notwithstanding the verdict on TGP’s
claims for “Realignment of compressor costs,” “Replacement and installation of
operable oil fill systems,” and “Review of ‘as-built’ drawings.” We reverse the trial
court’s judgment as to these claims and render judgment that TGP take nothing on
these claims. 

          The trial court’s judgment is affirmed in all other respects. 

 
 
                                                             Laura Carter Higley 

                                                             Justice

 
Panel consists of Justices Taft, Hanks, and Higley.