SOUTHEASTERN PIPE LINE
COMPANY, INC., Trustee,
et al., Petitioners,

v.

Frances TICHACEK, et
al., Respondents.

No. 98–0728.

Supreme Court of Texas.

Argued April 6, 1999.

Decided June 10, 1999.

Rehearing Overruled Sept. 9, 1999.

Charles W. Gordon, IV, Corpus Christi, William Pannill, David L. Monroe, Houston, Larry E. Wadler, Wharton, Rick F. Rogers, Corpus Christi, Bertrand C. Moser, Houston, Roy L. Barnes, Houston, for Petitioners.

Fulbright & Jaworski L.L.P., William D. Wood, William J. Boyce, Jennifer L. Price and Peggy S. McClard, Houston, Texas, Paul Webb and Vincent L. Marble III, Wharton, Texas, for Respondents.

Justice O'NEILL delivered the opinion for a unanimous Court.

Southeastern Pipe Line Co. acquired certain oil and gas leases from Frances and Victor Tichacek, Henry and Darlene Divin, Reed and Lou Ann Kubena, and John Rabius (collectively, "lessors"). When the leases were about to expire for nonproduction, Southeastern extended them by pooling the leases with producing acreage to form a unit. The lessors sued, claiming that Southeastern had pooled in bad faith and failed to protect their leases from substantial drainage. The jury upheld Southeastern's formation of the pooled unit, but found that Southeastern

failed to protect the individual leases from drainage. The drainage liability and damages questions, as framed, did not account for the pooled unit by distinguishing between pre-pooling drainage from the leases and post-pooling drainage from the unit. The jury awarded damages based upon estimated production from a hypothetical unit the lessors' experts testified should have been formed to protect the leases. The court of appeals affirmed the trial court's judgment on the verdict, and remanded for a recalculation of prejudgment interest. 977 S.W.2d 393.

We must decide whether the drainage questions were erroneous for failure to account for the pooled unit and, if so, whether that error made the questions immaterial or defective. If they were immaterial, then Southeastern would be entitled to judgment in its favor. If, however, the questions were defective, then the lessors are entitled to a new trial. We hold that the lessors may not premise recovery for drainage on their own pooling preferences, as reflected in their experts' hypothetical unit, when the lessee's formation of a different unit is made in good faith. Therefore, the drainage questions, which did not account for the pooled unit, were erroneous. We also hold that the questions submitted were defective rather than immaterial, and that the lessors are entitled to a new trial on the drainage claim. Accordingly, we reverse the court of appeals' judgment in part and remand to that court for further proceedings consistent with this opinion.

# I

## Background

In the late 1950s, Stanley C. Woods began taking leases and drilling for natural gas in the western part of the East Bernard Field in Wharton County.[1] Some thirty years later he decided to explore the eastern part of the field, and in 1990 his company, Southeastern, drilled a "wildcat" test well on a lease that it had acquired from W.C. and Zela Leveridge.[2] The test well, known as the W.C. Leveridge Well No. 4, was successful, ultimately producing more than three million cubic feet of gas per day.

With the success of Well No. 4, Southeastern sought to protect its interest in the field from drainage by another operator, and in late 1990 and early 1991 negotiated three-year leases on the lessors' adjacent property to the north. Southeastern did not drill on the lessors' tracts to the north, but drilled two more successful wells on the W.C. Leveridge tract, Well No. 5 in 1992 and Well No. 6 in 1993.

In August 1993, Southeastern sought to extend its leases on the northern acreage for three more years. The lessors, believing that Southeastern had not diligently developed their acreage, refused. On December 15, 1993, four days before the first of the northern leases was to expire, Southeastern pooled the leases with acreage surrounding the W.C. Leveridge Well No. 5 to form a 350-acre unit.[3] Half of the unit's acreage came from the Leveridge leases and the other half from the lessors'. Because there was production on the pooled unit from Well No. 5, the lessors' leases were automatically extended.

The lessors, who had anticipated new leasing opportunities when their leases expired, believed that Southeastern had pooled their leases in bad faith. They

1. Woods eventually consolidated his leases with other investors under the name Southeastern Pipe Line Company.

2. W.C. Leveridge later died, leaving Zela in charge of the property.

3. Until this time, Zela Leveridge had refused to allow her property to be pooled with non-Leveridge land, in keeping with her lease's pooling provision. Woods and his geologist warned her, however, that a well on the northern leases might drain her acreage. So, in November 1993, Zela Leveridge agreed to pool the lessors' leases with one well on her land as long as one half of the unit acreage came from Leveridge lands.

notified Southeastern that the pooling was invalid and that the leases had therefore expired. In response, Southeastern filed this suit seeking a judgment declaring the leases to be valid. The lessors filed counterclaims alleging that Southeastern had pooled the leases in bad faith and had breached the implied covenant to protect their leases from substantial drainage.

Before trial, Southeastern sought to bifurcate and resolve the bad-faith pooling question before determining the drainage issue. It claimed, among other things, that resolution of the pooling question would affect submission of the drainage issue. Although the trial court initially granted Southeastern's request, it ultimately denied the motion on rehearing. The trial court realigned the lessors as plaintiffs and Southeastern as defendant, and the case proceeded to trial.

The lessors' experts, petroleum engineer Ricardo Garza and geologist Robert Hilty, testified that there were substantial gas reserves beneath the northern leases that had been substantially drained by the W.C. Leveridge Well Nos. 4, 5, and ·6. Garza was of the opinion that, in order to protect the leases, Southeastern should have drilled two off-set wells on the lessors' acreage, one in January 1992 and the other in January 1993. Garza proposed two hypothetical units upon which the wells should have been drilled, and calculated drainage damages based upon the pre-trial and post-trial royalties the lessors would have received had the units been formed and the proposed wells drilled. The lessors' experts did not take into account the unit that Southeastern actually pooled. Southeastern countered with its own expert testimony that it had acted as a reasonably prudent operator in forming the W.C. Leveridge No. 5 Unit as and when it did because of uncertainty regarding the location and effect of a fault running through the northern leases and Zela Leveridge's prior refusal to pool.

The jury found that Southeastern did not pool in bad faith, thus validating the Leveridge No. 5 Unit. It did find, however, that Southeastern had failed to protect the individual leases from substantial drainage. Neither the drainage liability nor damages question accounted for the Leveridge No. 5 Unit by segregating pre-pooling drainage of the individual leases from post-pooling drainage of the unit. The jury awarded damages based upon Garza's calculations of what the lessors would have received if a well had been drilled on his first hypothetical unit in 1992. The trial court rendered judgment on the verdict, awarding ten percent prejudgment interest compounded daily. The court of appeals affirmed the trial court's judgment, but reversed and remanded for the trial court to recalculate prejudgment interest as simple interest. 977 S.W.2d at 401.

Southeastern contests the drainage award on two grounds. First, it contends the award, which is based upon estimated production from Garza's first hypothetical unit, is unsupported because the lessors' leases contain pooling restrictions that expressly prohibit formation of the proposed unit, and it had no duty as a reasonably prudent operator to seek lease amendments that would obviate these restrictions. Second, Southeastern claims that, once the jury upheld formation of the Leveridge No. 5 Unit, the lessors could not simply ignore it in favor of their own pooling preferences. In the absence of separate liability findings of pre-pooling drainage from the leases and post-pooling drainage from the unit, Southeastern claims the trial court had no basis to award damages as it did. For the reasons explained below, we agree that the drainage award is improper because it fails to account for the unit that was actually pooled and upheld by the jury. Once the jury determined that the Leveridge No. 5 Unit was valid, the lessors could no longer rely on their own pooling preferences to establish drainage. Consequently, we do not address the propriety of the lessors' hypothetical units.

## II

### Pooling and the Duty to Protect

■ Certain covenants are implied in most oil and gas leases. The standard of care in measuring a lessee's performance of these implied covenants is that of a reasonably prudent operator carrying out the purposes of the lease under the same or similar circumstances. *See Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 567–68 (Tex.1981). One of these covenants imposes a duty to protect the leasehold from local and field-wide drainage. *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 889 (Tex.1998). In order to recover for breach of the duty to protect from drainage, a lessor must present proof (1) of substantial drainage of the lessor's land, and (2) that a reasonably prudent operator would have acted to prevent the drainage. *See Amoco Prod. Co.,* 622 S.W.2d at 568.

■ A lessor may employ various methods to satisfy its duty to protect the leasehold from drainage, depending upon the circumstances. *See id.* A common protective measure is for the lessee to exercise its contractual pooling authority and combine tracts from two or more leases into a single unit around an existing well. Formation of such a unit is called "pooling." *See London v. Merriman,* 756 S.W.2d 736, 739 n. 1 (Tex.App.—Corpus Christi 1988, writ denied).

■ A lessee has no power to pool without the lessor's express authorization, which is usually contained in the lease's pooling clause. *See Jones v. Killingsworth,* 403 S.W.2d 325, 327 (Tex.1965). For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease. *See id.* at 327–28. A lessee's pooling decision will be upheld unless the lessee pools in bad faith. *See Circle Dot Ranch, Inc. v. Sidwell Oil & Gas, Inc.,* 891 S.W.2d 342, 346 (Tex.App.—Amarillo 1995, writ denied); *Elliott v. Davis,* 553 S.W.2d 223, 226–27 (Tex.Civ. App.—Amarillo 1977, writ ref'd n.r.e.).

■ The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit. *See Southland Royalty Co. v. Humble Oil & Ref. Co.,* 151 Tex. 324, 249 S.W.2d 914, 916 (1952); 1 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 4.8, at 225–26 (1996) (stating that "production from the unit well is deemed to have taken place on all leases pooled into the unit …"). If the lessee pools in good faith, the lessee is relieved of the obligation to reasonably develop each tract separately, or to drill off-set wells on other tracts included in the unit to prevent drainage by a well on one or more of such tracts. *See Southland,* 249 S.W.2d at 916. In other words, there can no longer be drainage of the individual leases by a unit well, only drainage of the unit by wells located outside the unit. *See id.* Conversely, if the unit is not pooled in good faith, production will be considered to take place only on the actual tract upon which it occurs, and production from a unit well will not maintain off-site leases. *See Killingsworth,* 403 S.W.2d at 328; SMITH & WEAVER, *supra,* at 228.

In the present case, Southeastern had several options to protect the northern leases from drainage, including: (1) dropping the leases so that another operator could develop them, which the lessors preferred; (2) drilling off-set wells on the leases, as proposed by the lessors' experts; and (3) pooling with one or more producing wells on other tracts, which Southeastern did. The jury found that Southeastern did not pool the Leveridge No. 5 Unit in bad faith, thus validating Southeastern's pooling choice. While we agree with the court of appeals that the jury's validation of the pooled unit did not exonerate Southeastern from liability for failing to protect the lessors' lands from drainage, we do not agree that Southeastern's pooled unit, once validated, could be ignored in favor of the lessors' own pooling preferences. Rather, the lessors were required to segregate

their claims between pre-pooling drainage from the leases and post-pooling drainage from the unit.

## III

### Effect of the Leveridge No. 5 Unit

The drainage liability issue was submitted to the jury in Question No. 3 as follows:

> Did Southeastern fail to protect the *Subject Leases* from substantial drainage?

(Emphasis added). The "Subject Leases" are described in the charge as the individual leases known as the Divin Lease, the Rabius Lease, the Kubena Lease, and the Tichacek Lease. The jury was further instructed that a reasonably prudent operator must "conduct operations *on the lease*" for the mutual advantage of the lessor and the operator. (Emphasis added). The damages issue was submitted in Question No. 4B as follows:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Landowners for their damages, if any, resulting from such failure to protect the *Subject Leases* from drainage?

(Emphasis added). Neither the questions nor the accompanying instructions directed the jury to distinguish between pre-pooling drainage from the leases and post-pooling drainage from the unit if they found that Southeastern had not pooled in bad faith. As a result, Southeastern claims, the questions are erroneous. We agree.

Each of the subject leases contains identical provisions granting Southeastern "the right, at its option, to pool or unitize any land covered by this lease ... with any other land, lease, or leases...." The leases authorized Southeastern to pool at any time during the life of the lease, "whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith." The pooling clause provided that a unit established thereunder would be valid and effective for all purposes of the lease, and that production from lands pooled with the lease would become production from the lease. The only restriction on Southeastern's pooling authority is found in the Divin, Rabius, and Kubena leases. A typed rider to those leases required Southeastern to pool at least one-half of the leased acreage in any unit.

It is undisputed that the leases granted Southeastern the authority to form the Leveridge No. 5 Unit, and that in doing so Southeastern complied with all pooling restrictions contained in the leases. Beyond the express terms of the lease, a lessor has no power to direct a lessee in its good faith pooling decisions or to revoke its authority to join in pooled units. *See* SMITH & WEAVER, *supra,* at 229–1; 4 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL & GAS § 48.3, at 213, 222 (1990). Once the jury upheld formation of the Leveridge No. 5 Unit, the lessors' preferred hypothetical units became irrelevant. In other words, once it was found that a unit was validly formed, that unit could not be ignored, as it was in this case, in assessing liability and damages.

The lessors offer three reasons why Question No. 3 properly inquired about drainage from the leases rather than from the unit: (1) the lessee is required to protect the individual leasehold from drainage, not the unit; (2) the duty to pool in good faith and the duty to prevent substantial drainage are independent duties under Texas law; and (3) the Leveridge No. 5 Unit was properly accounted for in Question 4B because production from the unit was applied to mitigate the lessors' damages. The lessors further claim that, if Southeastern had acted earlier to prevent drainage by drilling an offset well on the leases in 1992, there would have been no need to form the Leveridge No. 5 Unit in December 1993. These arguments, however, presuppose that the unit was created in bad faith and that the lessors are entitled to rely on their own

pooling preferences. That the lessors would have chosen to form a different unit does not mean that they can ignore the unit that was actually formed and upheld by the jury. In such a situation, the lessors could only recover for drainage resulting from the lessee's failure to reasonably protect (1) the individual leases before pooling, and (2) the unit after pooling. Because the questions submitted failed to draw this distinction, they were erroneous.

We must now determine whether the jury questions concerning drainage were immaterial or defective. If, as a result of the jury's validation of the unit, the questions were rendered immaterial, then the trial court should have disregarded them and rendered judgment for Southeastern. *See Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 155 (Tex.1994). If they were defective for failure to submit the drainage issue properly, the drainage claims must be remanded, provided Southeastern preserved error. *See id.*

## IV

### Were Questions Immaterial or Defective?

■ The jury's answers to the drainage questions may only be disregarded if they have no support in the evidence or if they are immaterial. *See Spencer,* 876 S.W.2d at 157; *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex. 1966). A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings. *See Spencer,* 876 S.W.2d at 157. A question is defective, however, if it plainly attempts to request a finding on a recognized cause of action, but does so improperly. *See id.*

■ The jury found that Southeastern failed to protect the individual leases from substantial drainage, and there was evidence that Well Nos. 4, 5, and 6 had drained the leases before the unit was formed. Breach of the duty to protect against substantial drainage is a well-established cause of action and the jury's findings were clearly material to this issue. *See id.* The lessors never abandoned their claim that the leases were drained, but simply requested an improper submission of the issue to the jury. The failure to include instructions confining the jury's consideration to pre-pooling drainage renders the questions defective, not immaterial. *See id.* Thus, provided that Southeastern properly objected, it is entitled to a new trial on the drainage issues. *See id.*

■ The lessors respond that Southeastern waived error by not objecting to submission of the drainage issues. Our review of the record, however, indicates that Southeastern preserved error by timely and plainly making the trial court aware of its complaint and obtaining a ruling. *See State Dept. of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). Southeastern made the trial court aware of its complaint at the very beginning of the trial, when it moved to bifurcate the issues of bad-faith pooling and drainage. During the hearing and the rehearing of its motion, Southeastern urged that it "need[ed] an answer to the unit question to know how to present damages to the jury." It even responded to the trial court's request for a proposed charge with a detailed explanation of the need to segregate the claims:

> If the jury finds that Southeastern pooled the leases in good faith, [the lessors] are not entitled to any damages for bad-faith pooling or drainage after the designation of the unit. The sole remaining question, with regard to [the lessors'] claims, would be whether they were entitled to any drainage damages prior to the formation of the unit.... A proper issue would be as follows:

> > Do you find that any of the Landowners' leases suffered substantial drainage between their effective date and December 15, 1993, when the W.C.

Leveridge No. 5 Gas Unit was formed?

Although Southeastern's objections at this stage of the trial would alone be insufficient to preserve the issue, Southeastern reurged its prior objections during the charge conference:

> We object to the submission, however, of the entire Question 3 and 4A and B because the Court should first obtain a finding as to whether or not the unit is in good faith or bad faith formed and whether or not the unit is valid.

\* \* \*

> Therefore, we would request that the Court submit only Questions 1 and 2 in a bifurcated jury proceeding and then submit any question about drainage and other issues after that. The point being, the issues of bad faith pooling and substantial drainage overlap and cannot reasonably be submitted to the jury in one charge.

> If the unit is formed in good faith, there can be no finding of a failure to protect from drainage after the formation of the unit.

We conclude that Southeastern properly preserved error on this issue.

## V

### Conclusion

Because the drainage questions were defective for failure to account for the Leveridge No. 5 Unit, the lessors' drainage claims must be remanded. The lessors brought contingent cross-points in the court of appeals contesting the factual sufficiency of the evidence to support (1) the jury's finding that Southeastern did not pool the unit in bad faith, and (2) the amount of attorneys' fees awarded by the jury. The court of appeals did not address these issues, and we have no jurisdiction to consider them. Consequently, we reverse the court of appeals' judgment affirming the trial court's drainage award, and remand to the court of appeals for consider-ation of the lessors' cross-points and for further proceedings consistent with this opinion. Due to our disposition, we do not address the issue of prejudgment interest.