# NO. 12-16-00068-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *XTO ENERGY INC.,*<br>*APPELLANT* | § | *APPEAL FROM THE 273RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *ELTON GOODWIN,*<br>*APPELLEE* | § | *SAN AUGUSTINE COUNTY, TEXAS* |

## *OPINION*

XTO Energy, Inc. appeals the trial court's judgment and award of damages rendered in favor of Elton Goodwin. XTO presents seven issues on appeal. We reverse and render in part and affirm in part.

## BACKGROUND

In 2007, Goodwin signed an oil and gas lease with CS Platinum, which covered three tracts he owned in San Augustine County consisting of approximately 27 acres, 55 acres, and 2 acres. Under the terms of a letter agreement incorporated within the lease, CS Platinum paid Goodwin a lease bonus based on its determination that Goodwin held a 50% mineral interest in the 55-acre tract and a 100% mineral interest in each of the other two tracts.

After depositing the lease bonus check, Goodwin learned that he might hold more than a 50% mineral interest ownership in the 55-acre tract and began questioning the accuracy of his represented ownership interest. After XTO acquired the lease, Goodwin advised XTO that he believed the lease was void because he had not been paid the proper lease bonus under the letter agreement. XTO ultimately acknowledged a mistake had been made in determining Goodwin's mineral ownership interest in the 55-acre tract but disagreed the lease was void.

In 2010, XTO formed the Butler Rooney Unit, which included Goodwin's three tracts. In 2011, XTO successfully drilled the Butler Rooney 1H well in the unit and Goodwin began receiving royalty payments from that well in 2012. Around the same time, XTO formed the Terrapins Unit located just south of and adjacent to the Butler Rooney unit. XTO's plan for the Terrapins Unit involved drilling two horizontal wells. The plan called for the wellbores of each well to remain within the confines of the Terrapins Unit, although the proposed wellbore paths would be travelling close to the subsurface boundary plane of Goodwin's 27-acre tract.

The Terrapins 1H well was drilled first. During the vertical drilling phase, the drill bit drifted horizontally but away from Goodwin's boundary line and was successfully completed. Subsequently, XTO commenced drilling the Terrapins 1HB. Like the Terrapins 1H, the drill bit for the Terrapins 1HB well drifted horizontally during the vertical drilling phase. However, unlike the Terrapins 1H, the drill bit for the Terrapins 1HB drifted towards Goodwin's property. On April 25, 2012, a gyroscopic survey revealed the wellbore was within 60 feet of the subsurface boundary plane of Goodwin's 27-acre tract.

Aware of the wellbore's close proximity to Goodwin's boundary line, XTO chose to continue drilling. A gyroscopic survey conducted on May 5, 2012, showed the wellbore had crossed 126 feet into Goodwin's tract at a depth of slightly over 10,000 feet. During a meeting on May 8, 2012, when the wellbore was about halfway through the trespass path and the casing had been set, XTO decided to continue drilling. The wellbore was turned and drilling continued with the wellbore exiting the boundary plane of Goodwin's tract at a measured depth of 13,200 feet. XTO finished the well and released the rig from the well site on June 2, 2012. The approximate length of the trespass path into Goodwin's subsurface property was 2,900 linear feet.

Afterwards, an XTO representative approached Goodwin and informed him of the wellbore's intrusion into his property and requested a subsurface easement. In this same time period, XTO suspended Goodwin's royalty payments from the Butler Rooney 1H claiming he had been overpaid due to an accounting error. Over the following weeks, XTO and Goodwin communicated several times regarding the amount of his mineral ownership interest in the 55-acre tract, the validity of the lease due to an insufficient lease bonus payment, the subsurface intrusion into Goodwin's property, and the suspension of royalty payments from the Butler Rooney 1H. The parties were unable to resolve these disputes, and Goodwin filed suit.

During the litigation, Goodwin obtained a partial summary judgment which voided the CS Platinum Lease because Goodwin had not been timely paid the full amount of lease bonuses due under the letter agreement. At trial, Goodwin presented claims of trespass, bad faith trespass, conversion, fraud, and bad faith pooling to the jury. The jury found that XTO committed (1) a trespass for which it awarded $815,392.00 in damages, (2) bad faith trespass for which it awarded $78,000.00 in damages, (3) bad faith pooling for which it awarded $1,272,331.80 in damages, and (4) conversion for which it awarded $636,668.90 in damages. The jury found that XTO did not act with malice or commit fraud. Goodwin elected to accept the damages awards for trespass and bad faith pooling, and the trial court entered a judgment for $2,088,723.80 plus pre-judgment interest. The trial court denied XTO's motions for judgment notwithstanding the verdict and to modify the judgment. This appeal followed.

## ACTIONABLE SUBSURFACE TRESPASS

As part of its first issue, XTO argues the evidence is legally insufficient to support Goodwin's cause of action for subsurface trespass. Specifically, XTO contends that Goodwin did not have a legally protected ownership interest in the subsurface two miles below the surface of his property sufficient to support a trespass cause of action.

## Standard of Review

In considering a legal sufficiency challenge, we review all the evidence in the light most favorable to the trial court's judgment and indulge every reasonable inference in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit any favorable evidence if a reasonable factfinder could and disregard any contrary evidence unless a reasonable factfinder could not. *Id*. at 822, 827. We may only sustain a legal sufficiency challenge when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the sole evidence offered to prove a vital fact, (3) the sole evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes the opposite of a vital fact. *Id*. at 810. More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair minded jurors to differ in their conclusions. *See* **Wal-Mart Stores, Inc. v. Spates**, 186 S.W.3d 566, 568 (Tex. 2006) (per curium). Anything more than a scintilla of evidence is legally sufficient to support the finding. **Cont'l Coffee Prods. Co. v. Cazarez,** 937 S.W.2d 444, 450 (Tex. 1996); **Reeder v. Wood Cty.**

3

*Energy, L.L.C.*, 320 S.W.3d 433, 441 (Tex. App.—Tyler 2010), *aff'd in part and rev'd in part*, 395 S.W.3d 789 (Tex. 2012).

**Applicable Law**

The owner of realty generally "has the right to exclude all others from use of their property." *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 424 (Tex. 2015) (quoting *Severance v. Patterson*, 370 S.W.3d 705, 709 (Tex. 2012)). Trespass to real property is an unauthorized entry upon the land of another which occurs when one enters—or causes something to enter—another's property. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 46 (Tex. 2017). Every unauthorized entry upon land of another is a trespass even if no damage is done or the injury is slight. *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 12 n.36 (Tex. 2008) (quoting *McDaniel Bros. v. Wilson*, 70 S.W.2d 618, 621 (Tex. Civ. App.—Beaumont 1934, writ ref'd)).

The surface overlying a leased mineral estate is the surface owner's property, and those ownership rights include the geological structures beneath the surface. *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974). The surface owner, not the mineral owner, "owns all non-mineral 'molecules' of the land, i.e., the mass that undergirds the surface" estate. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 442 (5th Cir. 2011). The conveyance of mineral right ownership does not convey the entirety of the subsurface. *Id.* Although the surface owner retains ownership and control of the subsurface materials, a mineral lessee owns a property interest—a determinable fee—in the oil and gas in place in the subsurface materials. *Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 940 (Tex. 1935).

**Analysis**

The facts related to the drilling of the Terrapins 1HB well are not in dispute. XTO conceded at trial and on appeal that the Terrapins 1HB wellbore crossed the boundary plane into Goodwin's subsurface property, that it was not authorized to do so, and that the cased wellbore represents a permanent subsurface intrusion onto Goodwin's property. No evidence was presented that this subsurface intrusion negatively impacted the surface of Goodwin's property or that the cased wellbore would interfere with Goodwin's ability to develop minerals under his property.

XTO argues that dicta contained within a 2012 Texas Supreme Court opinion stands for the proposition that a property owner does not have a legally protected ownership interest in the subsurface of his property that would support a trespass cause of action. *Coastal Oil & Gas Corp.*, 268 S.W.3d at 12. It points to the court's reference that the ancient maxim that land ownership extends to the sky above and earth's center below "has no place in the modern world." *Id*. at 11.[1] Using an example of an aircraft wheeling across the surface of one's property without permission as being a trespass while flying the plane through the airspace two miles above the property as not, the court stated the law of trespass "need no more be the same two miles below the surface than two miles above." *Id*. Though *Coastal* did not decide the issue of whether the incursion of hydraulic fracturing fluid and proppants into another's land two miles below the surface constitutes an actionable trespass, XTO argues the opinion sends a clear message that a wellbore's deep subsurface intrusion into another's property alone, such as in this case, will not support a trespass claim.

In 2015, the Texas Supreme Court addressed a subsurface trespass claim resulting from subsurface migration of wastewater onto an adjacent property. *Envtl. Processing Sys., L.C.*, 457 S.W.3d at 416. The court avoided answering whether Texas law recognizes a trespass cause of action for deep subsurface water migration by deciding the case on other grounds and neither confirmed nor rejected the dicta in *Coastal* that an ownership interest in the surface estate does not extend into the subsurface such as to support a trespass cause of action. *Id.*

In 2017, the Texas Supreme Court addressed whether drilling through one mineral estate to reach an adjacent tract without the consent of the mineral estate holder constituted a trespass as to the mineral estate. *Lightning Oil Co.,* 520 S.W.3d at 46. In concluding that the holder of the mineral estate does not have the right to prevent a third party from drilling a well with the permission of the surface estate holder through the mineral estate to access production on another tract, the court analyzed ownership rights between the surface and mineral estates in the subsurface and noted a distinction between the earth surrounding hydrocarbons and the earth embedded with hydrocarbons. *Id*.

Citing a 1974 Texas Supreme Court opinion, the court held the surface overlying a lease mineral estate is the surface owner's property, and those ownership rights include the geological

---

[1] "To whomsoever the soil belongs, he owns also to the sky and to the depths. The owner of a piece of land owns everything above and below it to an infinite extent." *Cujus est solum ejus est usque ad coelom et ad inferos*, BLACK'S LAW DICTIONARY (rev. 4th ed. 1968).

structures beneath the surface. *Id.* (citing *West*, 508 S.W.2d at 815). The court approved the reasoning used by the Fifth Circuit in ***Dunn-McCampbell***, that the surface owner, not the mineral owner, "owns all non-mineral 'molecules' of the land, i.e., the mass that undergirds the surface" estate. *Id.* Also approved was language that "ownership of the hydrocarbons does not give the mineral owner ownership of the earth surrounding those substances." *Id.* at 48 (quoting ***Springer Ranch, Ltd. v. Jones***, 421 S.W.3d 273, 283 (Tex. App.—San Antonio 2013, no pet.)). The 2017 opinion references the language in ***Coastal***, on which XTO relies, but placed no limitation on the surface owner's interest in the subsurface or implied that the surface owner's rights to the underlying earth ends at some depth below the surface. *Id.*

Accordingly, we reject XTO's argument that Goodwin did not have a legally protected ownership interest in the subsurface of his property at the depth of the Terrapins 1HB's wellbore intrusion that would support a trespass cause of action. Regardless of the depth that XTO's wellbore entered or exited Goodwin's subsurface, the approximately 2,900 linear feet the cased wellbore intruded into Goodwin's property constitutes an actionable trespass. *See id.* at 46. That part of XTO's first issue is overruled.

**TRESPASS DAMAGES**

In the remainder of its first issue, XTO argues Goodwin improperly based his trespass cause of action on a measure of damages which cannot withstand a legal sufficiency review when applying the proper measure of damages. In its third issue, XTO argues the trial court erred by allowing Goodwin's expert to present evidence of trespass damages in the form of a damage model based on the value of the trespass to XTO, rather than the traditional damage model for permanent injury to land.

**Applicable Law**

An expert witness may testify regarding scientific, technical, or other specialized matters if the expert is qualified and if the expert's opinion is relevant, reliable, and based on a reliable foundation. TEX. R. EVID. 702; ***Whirlpool Corp. v. Camacho***, 298 S.W.3d 631, 637 (Tex. 2009). To be relevant, an expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology. ***State v. Cent. Expressway Sign Assocs.***, 302 S.W.3d 866, 870 (Tex. 2009). Conclusory or speculative opinion testimony is not relevant because it does not tend to make the existence of material facts more probable or less probable.

*Whirlpool*, 298 S.W.3d at 637; *Coastal Transp. Co., Inc. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). Expert opinion that has no factual substantiation in the record is speculative or conclusory. *Beaumont v. Basham*, 205 S.W.3d 608, 621 (Tex. App.—Waco 2006, pet. denied); *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 463 (Tex. App.—Dallas 2005, no pet.). Expert testimony that is based on unreliable data or flawed methodology is unreliable and does not satisfy the relevancy requirement. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010). Unreliable expert testimony is legally no evidence. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

When expert testimony is involved, courts are to rigorously examine the validity of facts and assumptions on which the testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodology are applied by the expert to reach the conclusions. *Whirlpool*, 298 S.W.3d at 637. An expert's opinion might be unreliable if it is based on assumed facts that vary from the actual facts, or it might be conclusory if it is based on tests or data that do not support the conclusion reached. *Id.* For expert testimony to be admissible, each material part of the expert's theory must be reliable. *Id.* Opinion testimony on damages must be supported by objective facts, figures, or data from which the amount may be ascertained with reasonable certainty; if it is not, it is speculative and conclusory and will not support a judgment. *Paradigm Oil, Inc. v. Retamco Operating, Inc*., 242 S.W.3d 67, 74 (Tex. App.—San Antonio 2007, pet. denied).

**Analysis**

To prove actual damages resulting from the wellbore's subsurface trespass, Goodwin presented evidence from its expert, Rex White. White testified that his damage calculation resulting from XTO's subsurface trespass into Goodwin's property totaled $815,392.[2]

White used a two-step approach to derive this number. First, he determined the total linear feet of the Terrapins 1HB wellbore and the linear feet the wellbore trespassed onto Goodwin's property. White calculated the trespass path constituted 14.899 percent of the wellbore's total linear feet. Second, White estimated the value of the Terrapins 1HB. He did so by reviewing excerpts from annual reports XTO filed with the Securities and Exchange Commission (SEC) which reflected XTO's representation as to the value of the Terrapins 1HB

---

[2] This was the damage amount for trespass awarded by the jury to Goodwin.

well in 2012, 2013, and 2015. White testified those filings reflected the Terrapins 1HB had a present value of 1.1 million in 2012, 3.77 million in 2013, and 5.47 million in 2015. White pointed out two variables of gas price and flat life as an explanation for the difference in the valuations over the years represented.[3] For 2012, White stated XTO used a gas price of $2.36 with a flat life of 27 years. For 2013, XTO used a gas price of $3.23 with a flat life of 29 years. For 2015, XTO utilized a gas price of $3.86 with a flat life of 29 years. Using XTO's 2015 valuation of Terrapins 1HB at $5,472,797, White concluded fair compensation to Goodwin, as a one-time payment resulting from the subsurface trespass, would be $815,392 which he derived by multiplying XTO's valuation by the percentage of the Terrapins 1HB wellbore trespass.[4]

XTO argues that White's testimony should not have been admitted and constitutes no evidence to support the trespass award because he utilized a damages model inconsistent with and not allowed for a trespass causing permanent injury to land. It argues White's testimony was based on false assumptions as to the measure of recoverable damages and usurped the role of the court to determine and instruct the jury on the law controlling the case. In short, XTO argues White was impermissibly allowed to opine a subjective theory of damage recovery for a subsurface trespass in contradiction to well-established Texas law as to compensable damages for permanent injury to surface damage to land. Even if we were to hold that White's damages model theory for subsurface trespass, which compensates the landowner based on the reasonable value of the land use by the trespasser, was proper White's testimony was unreliable and, therefore, constituted no evidence to support the jury's trespass damages award.

The two components of White's damages model were the percentage of the Terrapins 1HB wellbore that trespassed into Goodwin's property and the value of the Terrapins 1HB well. As to the former, this was simply a mathematical computation based on data contained within undisputed drilling reports. The second component of White's equation, i.e., the value of the Terrapins 1HB well, is where the flaw in White's analysis lies.

White assumed and accepted as true that the Terrapins 1HB has the value projected by XTO in its SEC filings. This assumption was improper for several reasons. First, each of the

---

[3] Flat life represents XTO's designation of the duration the well is expected to produce. Though White did not testify as to the gas price unit, the documents admitted into evidence reflect a pricing unit of "Mcf" which represents a volume of 1,000 cubic feet of natural gas.

[4] White also testified as to damages related to XTO's alleged bad faith pooling, bad faith trespass, conversion, and fraud but for reasons set forth later in this opinion, we are only addressing White's testimony as it pertains to Goodwin's trespass claim.

three valuations are labeled "Forecast." White conceded he had no information related to the value of the Terrapins 1HB other than that found within the documents. He performed no independent analysis of the shale formation in which the well was drilled, the amount of reserves within the formation, the production output or life expectancy of nearby similar wells, the number of perforations within the formation near the Terrapins 1HB, or allocation among adjoining pooling units. Other parts of White's analysis are similarly lacking. He did not provide any factual information about past or future gas pricing, production costs, future production by other wells, or an effort to discount future production to present value.

White also admitted XTO's projected value of the Terrapins 1HB in its 2015 forecast was the sole basis of his well value determination. Expert testimony based on internal projections or valuations is not admissible when there is no evidence that the data is reliable. ***Citrin Holdings, LLC v. Minnis***, No. 14-11-00644-CV, 2013 WL 1928652, at \*11, n.16 (Tex. App.—Houston [14th Dist.] May 9, 2013, pet. denied) (op.). The fact that XTO forecasted a value for the Terrapins 1HB does not make it evidence that Goodwin can use to support a damage award against XTO. A confidential forecast contained within XTO's SEC filings is not, standing alone, evidence of reliability. There was no showing that XTO's valuation for the Terrapins 1HB was anything more than hopes for the future worth of the well. Such hopes do not establish a reliable component of a damages model. *See **id**.* at \*11-12.[5]

Second, no evidence of actual production from the Terrapins 1HB was presented. White characterized the damages estimate of $815,392 as a one-time number because he did not want Goodwin "gambling on the well lasting 2 or 29 years." This is an admission of the speculative nature of estimating the value of a well since length of production, much less viable economic production, is uncertain. The Terrapins 1HB has no documented production with the Texas Railroad Commission.[6] XTO's representative testified XTO was awaiting the outcome of the lawsuit before deciding whether to plug the well or proceed with completing it. Though White

---

[5] Similarly, damages models which seek to establish the value of well that has been destroyed based on projected future production has been rejected. The measure of damages for the destruction of an oil well that can be reproduced is the lower of two values: (1) the cash market value of the old well, or (2) the cost of reproducing the well with a new well equipped like the old one, less any salvage value of the old well. ***Basic Energy Serv., Inc. v. D-S-B Props., Inc***., 367 S.W.3d 254, 262 (Tex. App.—Tyler 2011, no pet.).

[6] The Texas Railroad Commission is vested with primary jurisdiction over oil and gas matters regulating drilling and production. It has the power and duty to regulate the production of oil and gas for the prevention of waste and the protection of correlative rights of producers. *See* TEX. NAT. RES. CODE ANN. § 85.058 (West 2011); *see also **Texaco, Inc. v. R.R. Comm'n of Tex.**,* 583 S.W.2d 307, 310 (Tex. 1979).

pointed out that XTO had filed a Form G-1 with the Commission, indicating the Terrapins 1HB had been completed and perforated, he acknowledged that no production reports had been filed and conceded that, absent production, the value of the Terrapins 1HB would be zero.

Third, even if the Terrapins 1HB had been completed and capable of production, White acknowledged that XTO did not have the legal right to production from the well until it obtained an "easement, contract, permit or other type of authority" from Goodwin to transport recovered gas through the wellbore under Goodwin's property. He testified the 2,890 feet of pipe and hole is "absolutely a fundamental part of the entire wellbore necessary to produce gas from underneath the Terrapins Unit to the surface." White acknowledged that production could not occur without use of the wellbore under Goodwin's property and XTO would have to obtain Goodwin's permission to do so. Though not calling his suggested damages award a payment for an easement, White characterized his damages estimate as a "fair trade" without explaining how the award would provide XTO any greater right to transport gas through the wellbore under Goodwin's property than it had before.

At best, White's theory provides only a yardstick to ascertain the value of a subsurface easement. But XTO is not entitled to receive a subsurface easement from Goodwin nor is Goodwin obligated to provide one to XTO. Without the authority to utilize that portion of the wellbore path under Goodwin's property to transport gas produced by the Terrapins 1HB, the well has no value. If XTO chooses not to seek an easement or if Goodwin chooses not to provide one, the Terrapins 1HB has no value and the money XTO invested to drill the well will have been wasted.

Because White did not account for this reality, provided no evidence as to the reliability of XTO's forecast valuations in its SEC filings, and there has been no reported production, his testimony as to the value of the Terrapins 1H was unreliable and constituted no evidence in this case to support the trespass award. Expert testimony that is based on unreliable data or flawed methodology is unreliable and does not satisfy the relevancy requirement and is legally no evidence. *Hughes*, 306 S.W.3d at 234; *Havner*, 953 S.W.2d at 714. XTO's third issue is sustained in part.[7]

---

[7] Because of our finding as to XTO's third issue, which is dispositive of its legal and factual challenge as to the trespass damages award, we need not decide the question, raised as part of XTO's first issue, of whether the court submitted the wrong measure of damages for a permanent injury to land and that part of its third issue contending the trial court erred by allowing White to present a theory of recovery to the jury based on the value of

In its second issue, XTO contends there is no evidence to support the jury's award of $1,272,331.80 for bad faith pooling.  In particular, it argues that when Goodwin obtained a summary judgment ruling that the 2007 CS Platinum Lease was void, he was not entitled to receive production proceeds from wells not drilled on his property and there could be no pooling of his tracts with other lands to receive a proportionate amount of proceeds from wells drilled within a pooled unit.  The argument continues that because the voidance of the CS Platinum Lease prevented Goodwin's tracts from being pooled in the first place, XTO could not have pooled those tracts in bad faith.

**Applicable Law**

Pooling allows a lessee to join land from two or more leases into a single unit.  ***Browning Oil Co., Inc. v. Luecke***, 38 S.W.3d 625, 634 (Tex. App.—Austin 2000, pet. denied).  Operations anywhere within the unit are treated as if they occurred on all the land within the unit, and production from a well on the pooled unit is treated as occurring on all the tracts pooled into the unit.  ***Id.***  Ordinarily, all participants to a pooling agreement cross-convey to one another an interest in the minerals subject to the agreement.  ***Montgomery v. Rittersbacher***, 424 S.W.2d 210, 213 (Tex. 1968).  Through cross-conveyance, all the parties subject to the pooling agreement own an undivided interest in the pooled mineral interests in proportion to their contribution to the unitized tract.  ***Id.***  Effective pooling in essence abrogates the rule of capture by allowing owners of non-producing tracts to share in production from the producing tract.  ***Luecke***, 38 S.W.3d at 634.

A lessee has no power to pool without the lessor's express authorization, which is usually contained in the lease's pooling clause.  ***Se. Pipe Line Co. v. Tichacek***, 997 S.W.2d 166, 170 (Tex. 1999) (citing ***Jones v. Killingsworth***, 403 S.W.2d 325, 327 (Tex. 1965)).  For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease.  ***Id.***  Generally, a lessee, pooling under a lease's pool clause, is subject to the implied requirement that he act fairly and in good faith.  ***Circle Dot Ranch, Inc. v. Sidwell Oil & Gas, Inc.***, 891 S.W.2d 342, 347 (Tex. App.—Amarillo 1995, pet. denied) (Dodson, J., concurring).  Even though the lessee's interest frequently conflicts with those of the lessor, the lessee must exercise the power

---

the wellbore to XTO.  Further, because Goodwin acknowledges it neither pled for nor sought a recovery under an assumpsit cause of action, we need not address that aspect of XTO's first issue.  TEX. R. APP. P. 47.1.

to pool in fairness and in good faith taking into account the interests of both the lessor and the lessee. *Id.* at 348.

**Analysis**

Assuming, without deciding, that the trial court correctly ruled that the CS Platinum Lease was void, Goodwin's mineral estate was not under lease when XTO drilled the Butler Rooney 1H, Terrapins 1H, and Terrapins 1HB wells. White conceded that no part of the Butler Rooney 1H or the Terrapins 1H wells were drilled on Goodwin's property. Other than the trespass path of 2,890 linear feet, no portion of the Terrapins 1HB is on Goodwin's property. Absent express authorization for his mineral interest to be pooled, Goodwin had no right to production from any well not drilled on his property. *Tichacek,* 997 S.W.2d at 170; *see Hunt Oil Co. v. Moore*, 656 S.W.2d 634, 642 (Tex. App.—Tyler 1983, writ ref'd n.r.e.).

Goodwin contends voidance of the CS Platinum Lease has no effect on his cause of action for bad faith pooling and, in support, cites to a 2008 Texas Supreme Court opinion. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419 (Tex. 2008). *Sheppard* dealt with the previously unaddressed issue of how a pool of producing properties is affected if a lease in the pool expires. *Id.* at 422. In finding that termination of a lease in that case did not terminate the unit, the court noted that a lease is not necessarily required for pooling because mineral owners can join a pool even if no lease exists. *Id.* While expiration of the lease changes who owns the mineral interests in the unit, it does not cause the unit to terminate because it was a pooling of lands, not just leases. *Id.* at 423.

Goodwin argues that bad faith pooling can be based on an operator's attempt to pool tracts that he does not have legal authority to pool. He points out that voidance of the CS Platinum Lease precluded XTO from pooling his tracts in the Butler Rooney Unit and when XTO was unable to secure a subsurface easement, it made knowing misrepresentations to the Texas Railroad Commission, as well as in the modified unit declaration it filed. Goodwin argues XTO continued its legally impermissible pooling attempts to avoid damages by virtue of its trespass onto Goodwin's tract and sanctions from the Commission due to the well going off unit. By doing so, Goodwin argues XTO sought to improperly utilize its pooling powers to the detriment of Goodwin which constitutes bad faith pooling. We disagree.

Bad faith pooling is the failure of a lessee to act fairly and in good faith as to a lessor. *Tichacek,* 997 S.W.2d at 170. If a lessee pools in good faith, the lessee is relieved of the

12

obligation to reasonably develop each tract separately or to drill off-set wells on other tracts included in the unit to prevent drainage. *Id*. Conversely, if the lessee does not pool in good faith, production will be considered to take place only on the actual tract upon which it occurs, and production from a unit well will not maintain off-site leases. *Id*. Inherent in this principle is that the lessee have the authority to pool leases in the first place. The implied duty owed by the lessee to a lessor as to the pooling provisions originates with the lease contract.

Without a valid lease or express agreement, XTO had no authority to pool Goodwin's tract with other lands or leases. But neither did it have an implied duty to prevent potential drainage from Goodwin's tracts from wells drilled on adjoining non-owned leased properties. To be liable for bad faith pooling, an operator must have the contractual authority to pool before it can breach the implied duty of fairness and good faith as to non-producing tracts in the exercise of its pooling powers. *See id. Sheppard* is distinguishable because the lease in that case was in effect and contained a standard industry pooling clause at the time the operator created the unit and other mineral interest holders in the unit had expressly authorized the pooling of their lands. The question in *Sheppard* was not whether the operator had authority to pool in the first place but rather what happens to the unit when a lease expires after the creation of the unit. *Sheppard*, 282 S.W.3d at 422. Here, there was never a valid lease which authorized XTO to pool Goodwin's tracts nor did Goodwin expressly authorize the pooling of his tracts by separate agreement. As such, *Sheppard* is inapplicable to this case.

Goodwin argues XTO purposely and intentionally sought to deceive Goodwin and the Commission in the actions it took both during and after drilling the Terrapins 1HB so as to either hide or excuse its subsurface trespass. But that argument does not afford a cause of action for bad faith pooling when XTO never had contractual authority to pool Goodwin's tracts in the first place. A void contract is no contract at all; it binds no one and is a mere nullity. *Watts v. Pilgrim's Pride Corp.*, No. 12-04-00082-CV, 2005 WL 2404111, at *3 (Tex. App.—Tyler Sept. 30, 2005, no pet.) (mem. op.). Goodwin has provided no authority, and we have found none, that would allow a cause of action for bad faith pooling based solely on an operator's attempt to pool

tracts or leases without contractual authority to do so. As a matter of law, XTO could not have committed bad faith pooling as to Goodwin's tracts. XTO's second issue is sustained in part.[8]

**BAD FAITH TRESPASS**

As part of its fourth issue, XTO contends there was no evidence to support the jury's finding and damages award for bad faith trespass. XTO argues that there could not have been a bad faith trespass as a matter of law because Goodwin does not have a legally protected ownership interest in the subsurface of his property that would support a trespass cause of action. Alternatively, XTO argues that bad faith trespass occurs only in the context of extracting oil, gas, or other minerals belonging to another without an honest belief in the superiority of title; thus, as a matter of law, bad faith trespass could not have occurred in this case because no minerals were extracted from Goodwin's tracts.

## Applicable Law

Bad faith trespass occurs when a lessee continues to enter under an oil and gas lease after its termination without a good faith belief in the existence of the lease. *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 557 (Tex. App.—San Antonio 2011, no pet.). To act in good faith in developing a tract for oil and gas, one must have both an honest and a reasonable belief in the superiority of his title. *Id.*

The commission of a trespass does not necessarily mean the actor will be liable for damages. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 920 (Tex. 2015). To determine what damages, if any, are recoverable for a trespass, the type of conduct or nature of the activity causing the entry must be identified. *Id.* "'While a trespass is a trespass, different recoveries are available, depending on the whether the trespass was committed intentionally, negligently, accidently, or by an abnormal dangerous activity.'" *Id.* (quoting *Watson v. Brazos Elec. Power Coop.*, 918 S.W.2d 639, 645 (Tex. App.—Waco 1996, writ denied)).

## Analysis

The evidence established that XTO was aware that the Terrapins 1HB drill bit was drifting towards Goodwin's boundary line during drilling. Instead of stopping the drilling, XTO proceeded drilling and cemented the casing. The evidence further showed XTO only approached

---

[8] Because we find that XTO did not commit bad faith pooling as a matter of law, we need not address that portion of issue two that asserts a legal challenge to the sufficiency of the evidence supporting the jury's damages award of $1,273,331.80. *See* TEX. R. APP. P. 47.1.

14

Goodwin after the trespass was made permanent when XTO cemented the wellbore. When unable to secure a subsurface easement from Goodwin, XTO then allegedly made misrepresentations to the Commission in a Rule 37 exception and filed a modified pooled unit declaration with the county clerk.

Goodwin argues these facts support the jury's finding that XTO acted with a conscious indifference to and disregard of Goodwin's rights and entitled him to additional damages. Those who knowingly and intentionally trespass, or who do so maliciously, may be liable for additional forms of damages. *Coinmach Corp.*, 417 S.W.3d at 922. To recover damages for trespass to real property, a plaintiff must prove that (1) the plaintiff owns or has a lawful right to possess real property, (2) the defendant entered the plaintiff's land and the entry was physical, intentional, and voluntary, and (3) the defendant's trespass caused injury to the plaintiff. *Corral-Lerma v. Border Demolition & Envtl., Inc.*, 467 S.W.3d 109, 120 (Tex. App.—El Paso 2015, pet. denied).

The jury found that XTO did not act with malice or fraud, which precluded Goodwin's recovery of exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West 2015). Because of our previous finding that Goodwin's expert offered unreliable testimony that constituted no evidence to support the trespass damages award, we need not address whether Goodwin was entitled to additional damages, absent a finding of malice, or whether the court improperly instructed the jury that it could consider the reasonable value of XTO's use of Goodwin's property.

When asked about his opinion of damages for bad faith trespass, White stated that his damages calculations for trespass and bad faith trespass were based upon the same calculation and he "sort of wrapped up all of those concepts [trespass and bad faith trespass] into that one number [$815,392]." As set forth above, White's testimony on trespass damages was unreliable and constituted no evidence in this case to support the trespass award to Goodwin because his testimony was based on unreliable data or flawed methodology, which does not satisfy the relevancy requirement. *See Hughes*, 306 S.W.3d at 234; *see also Havner*, 953 S.W.2d at 714. Even if a finding that a party's actions in a trespass case constituted conscious indifference to and disregard of another's rights, standing alone, would entitle the owner to additional damages, there is no evidence to support the jury's award of $78,000. Regardless of how egregious XTO's conduct may have been, the jury made no finding of malice or fraud and Goodwin's evidence did

15

not support a recovery for actual damages for trespass. XTO's fourth issue, as it pertains to the jury's award of damages for bad faith trespass, is sustained.

<h2 style="text-align:center">CONVERSION</h2>

Also in its fourth issue, XTO contends the evidence was legally insufficient to support the jury's conversion finding and damages award. In support, XTO argues there was no evidence any minerals belonging to Goodwin were extracted as a result of the subsurface intrusion from the Terrapin 1HB wellbore onto Goodwin's property. Alternatively, it argues that with the voidance of the CS Platinum Lease and no express agreement to pool his tracts by separate agreement, Goodwin had no interest in production because none of the wells in question were drilled on his property.

## Applicable Law

Conversion is classically defined as the unauthorized and wrongful assumption and exercise of dominion and control over the property of another, to the exclusion of or inconsistent with the owner's rights. *Rogers v. Ricane Enters., Inc.*, 930 S.W.2d 157, 165 (Tex. App.—Amarillo 1996, writ denied). It is unnecessary to a conversion claim that there be a manual taking of the property. *Id.* The elements of a conversion claim are (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Stroud Prod., L.L.C. v. Hosford*, 405 S.W.3d 794, 811 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

## Analysis

The jury found that XTO converted Goodwin's property and awarded $636,668.90 in damages. The jury was instructed that the court found as a matter of law the CS Platinum Lease was null and void. Goodwin argued that because the CS Platinum Lease was void, his mineral interest in his three tracts represented unleased property. Relying on his theory that the pooling of Goodwin's acreage in the Butler Rooney Unit was in bad faith, Goodwin claimed that XTO unlawfully converted revenue attributable to his unleased acres. However, as addressed above, we rejected Goodwin's theory that bad faith pooling can be premised on a lessee attempting to pool leases or lands that are not under lease or that the landowner has not authorized by separate

16

agreement. XTO could not have pooled Goodwin's tracts as a result of the court's voidance of the CS Platinum Lease and there is no evidence that Goodwin authorized the pooling of his tracts by separate agreement. Accordingly, XTO's fourth issue as to the jury's conversion finding and award of damages is sustained.

## MOTION FOR DIRECTED VERDICT

It its fifth issue, XTO argues the trial court erred by not granting its motion for directed verdict as to its counterclaim for breach of the division order contract, under which Goodwin received royalties by virtue of the pooling of the CS Platinum lease in the Butler Rooney Unit. It argues that as result of Goodwin obtaining voidance of the CS Platinum Lease, Goodwin was not entitled to production from the Butler Rooney 1H and is obligated to return the monies XTO paid to him. XTO seeks reversal of the directed verdict and rendition of judgment in its favor against Goodwin for the approximate $386,000 in royalty payments Goodwin received.

**Standard of Review and Applicable Law**

In reviewing the grant or denial of a directed verdict, an appellate court follows the standards for assessing the legal sufficiency of the evidence. *Hunter v. PriceKupeca, PLLC*, 339 S.W.3d 795, 802 (Tex. App.—Dallas 2011, no pet.). This requires a determination of whether there is any evidence of probative force to raise a fact issue on the question presented. *Id.* In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *Id.* A directed verdict is proper if a party fails to present evidence raising a fact issue essential to the right of recovery or if the party either admits or the evidence conclusively establishes a defense to the cause of action. *Id.* A reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided the directed verdict can be supported on another basis. *Id.*

Division and transfer orders do not convey royalty interests; they do not rewrite or supplant leases or deeds. *See Exxon Corp. v. Middleton*, 613 S.W.2d 240, 250 (Tex. 1981). Because of the principal of detrimental reliance, division and transfer orders bind underpaid royalty owners until revoked. *See id.* However, when an operator prepares erroneous orders and retains the benefits, division orders are not binding because the operator has profited from its

17

own errors thus negating unjust enrichment. *Gavenda v. Strata Energy, Inc*., 705 S.W.2d 690, 692 (Tex. 1986).

To recover on a claim for money had and received, a plaintiff must show that the defendant holds money that in equity and good conscience belongs to him. *Hunter*, 339 S.W.3d at 807. Such cause of action is not based on wrongdoing, but, instead, "looks only to the justice of the case and inquires whether the defendant has received money which rightly belongs to another." *Id.* (citing *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.)). In short, it is an equitable doctrine applied to prevent unjust enrichment. *Id.* In defending against such a claim, a defendant may present any facts and raise any defenses that would deny the claimant's right or show that the claimant should not recover. *Id.*

Money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered merely because the party at the time of the payment was ignorant of or mistook the law as to his liability. *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005) (citing *Pennell v. United Ins. Co.*, 243 S.W.2d 572, 576 (Tex. 1951)). The rule is a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a defendant may respond with the voluntary-payment rule as a defense. *Id.* Because public policy favors protecting the finality of payments when a person is aware of all the facts upon which the liability to make payments depends, and there is no fraud, deception, duress, or coercion involved, Texas courts have, at times, applied the voluntary-payment rule between private parties. *Id*. at 769. Though the scope of the voluntary-payment rule may have been diminished as the rule's equitable policy concerns have been addressed through statutory or other legal remedies, the rule has never been abrogated and still has limited application in Texas jurisprudence. *Id*. at 771.

**Analysis**

The basic premise of XTO's counterclaim for reimbursement of the royalties it paid Goodwin is that with the voidance of the CS Platinum Lease, Goodwin had no right to production from the Butler Rooney 1H because no part of that well was drilled on any of Goodwin's tracts. It argues Goodwin's failure to return the royalties he received was a breach of an implied covenant within the CS Platinum Lease and contractual provisions in the division order issued in connection with the pooling of Goodwin's tracts into the Butler Rooney Unit.

18

At the conclusion of the evidence, both sides argued they were entitled to a directed verdict on XTO's royalty reimbursement counterclaim. In support of its motion, XTO relied on evidence showing that the royalties it paid to Goodwin from the Butler Rooney 1H, Goodwin signed the lease and division order, and the Butler Rooney 1H was not drilled on any part of Goodwin's tracts. XTO's position was that by seeking voidance of the CS Platinum Lease to pursue damages for his tort theories of recovery and exemplary damages, Goodwin forewent his right to receive royalties from the Butler Rooney Unit. The argument continued that because Goodwin was never legally entitled to any of the royalties he received from the Butler Rooney 1H once the lease was voided, he became contractually obligated to repay those royalties to XTO under implied and express provisions contained within the lease and division order. Alternatively, XTO argued it was entitled to reimbursement of the royalties paid to Goodwin under the equitable theory of money had and received to prevent Goodwin from being unjustly enriched from royalties to which he was not legally entitled.

Goodwin sought a directed verdict on XTO's royalty reimbursement claim on grounds that XTO failed to prove up its entitlement to damages as a matter of law. Specifically, Goodwin argued that because XTO suspended Goodwin's royalty payments when it allegedly learned of its accounting error and represented to Goodwin it was crediting ongoing royalties against the alleged overpayment, XTO was required to present evidence showing the amount of the overpayment and the royalties earned during the suspension period to arrive at a net balance of monies Goodwin owed. Alternatively, Goodwin argues that XTO was not entitled to rely on the contractual indemnity provisions of the division order because XTO incorrectly drew up the division order and that the equitable doctrine of voluntary payment applies.

Our review of the record reveals no evidence of probative force to raise a fact issue on the question of XTO's entitlement to the royalty payments it paid to Goodwin from the Butler Rooney 1H production. The record conclusively establishes that (1) the royalty payments Goodwin received through the Butler Rooney Unit were derived from the Butler Rooney 1H; and (2) no part of the Butler Rooney 1H was drilled on Goodwin's property. However, the record also conclusively shows that Goodwin had no part in creating the errors resulting in XTO's alleged overpayment of royalties to him. In fact, the record shows Goodwin advised XTO, shortly after it acquired the CS Platinum Lease, that he believed he owned more than a 50%

19

interest in the minerals in the 55-acre tract and that the CS Platinum Lease may be void due to an insufficient lease bonus payment.

XTO formed the Butler Rooney Unit and prepared the division order associated with that unit. The record contains no evidence that any other royalty interest holder was negatively affected by the payments made to Goodwin. Nor does the record contain evidence as to who would receive the benefit of reimbursement of the royalties Goodwin received so as to refute that XTO would profit by the return of the approximate $386,000. When an operator prepares erroneous orders and retains the benefits, division orders are not binding because the operator has profited from its own errors, thus negating unjust enrichment. *Gavenda,* 705 S.W.2d at 692. XTO cannot rely on any contractual provisions of the voided CS Platinum Lease or the division order, which it prepared, to recover the royalties it paid Goodwin.

With the voidance of the CS Platinum Lease, Goodwin was not entitled to royalties from the Butler Rooney 1H and has been unjustly enriched by the receipt of the royalties from that well. However, XTO voluntarily paid those royalties to Goodwin. It had all the documents and information before it to assess and evaluate the merits of Goodwin's assertions as to the validity of the CS Platinum Lease and to accurately calculate his mineral interest ownership before it made the challenged payments. There is no evidence any accounting errors and incorrect determination as to the validity of the CS Platinum Lease was precipitated through Goodwin's fraudulent or deceptive conduct. Money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered merely because the party at the time of the payment was ignorant of or mistook the law as to his liability. *Peake*, 178 S.W.3d at 768. Voluntary payment was a defense to XTO's claim of unjust enrichment which was established as a matter of law based on the record before us. XTO's fifth issue is overruled.[9]

## DISPOSITION

We sustain XTO's second, third, and fourth issues and overrule its first and fifth issues. Accordingly, we *reverse* the judgment in part and *render* a take nothing judgment in favor of XTO as to Goodwin's recovery for trespass, bad faith trespass, bad faith pooling, and conversion

---

[9] Because of our previous rulings and disposition, we need not address XTO's sixth issue that prejudgment interest was improperly calculated or its seventh issue, alleged in the alternative, that the trial court improperly granted summary judgment declaring the CS Platinum Lease void. *See* TEX. R. APP. P. 47.1

and *affirm* that portion of the judgment awarding Goodwin a take nothing judgment as to XTO's royalty reimbursement claim.

**GREG NEELEY**
Justice

Opinion delivered October 18, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**OCTOBER 18, 2017**

**NO. 12-16-00068-CV**

**XTO ENERGY INC.,**
Appellant
V.
**ELTON GOODWIN,**
Appellee

Appeal from the 273rd District Court

of San Augustine County, Texas (Tr.Ct.No. CV-13-9496)

THIS CAUSE came to heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, it is the opinion of this Court that there was error in the judgment of the court below.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below is **reversed** in part, and a take nothing judgment is **rendered** that Appellee, **ELTON GOODWIN** take nothing as to his recovery for trespass, bad faith trespass, bad faith pooling and conversion and **affirm** that portion of the judgment awarding **ELTON GOODWIN** a take nothing judgment as to **XTO's** royalty reimbursement claim. It is further ORDERED that all costs of this proceeding shall be adjudged against the party incurring same.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*